# TENNESSEE *v.* LANE ET AL.

No. 02–1667.  Argued January 13, 2004—Decided May 17, 2004

510

*Michael E. Moore*, Solicitor General of Tennessee, argued the cause for petitioner. With him on the briefs were *Paul G. Summers*, Attorney General, *S. Elizabeth Martin*, and *Mary Martelle Collier*.

*William J. Brown* argued the cause for the private respondents. With him on the brief were *Samuel R. Bagenstos* and *Thomas C. Goldstein*.

*Deputy Solicitor General Clement* argued the cause for the United States urging affirmance. With him on the brief were *Solicitor General Olson, Assistant Attorney General Acosta, Patricia A. Millett, Jessica Dunsay Silver, Sarah E. Harrington,* and *Kevin Russell.**

---

*A brief of *amici curiae* urging reversal was filed for the State of Alabama et al. by *William H. Pryor, Jr.*, Attorney General of Alabama, *Nathan A. Forrester*, Solicitor General, *Gene C. Schaerr*, and *Richard H. Sinkfield III*, and by the Attorneys General for their respective States as follows: *Jon Bruning* of Nebraska, *Brian Sandoval* of Nevada, *Wayne Stenehjem* of North Dakota, *W. A. Drew Edmondson* of Oklahoma, *Patrick J. Crank* of Wyoming, and *Mark L. Shurtleff* of Utah.

Briefs of *amici curiae* urging affirmance were filed for the State of Kansas et al. by *Phill Kline*, Attorney General of Kansas, *David W. Davies*, Deputy Attorney General, and *Ralph James DeZago* and *Harry Kennedy*, Assistant Attorneys General, and by *M. Jane Brady*, Attorney Gen-

JUSTICE STEVENS delivered the opinion of the Court.

Title II of the Americans with Disabilities Act of 1990 (ADA or Act), 104 Stat. 337, 42 U. S. C. §§ 12131–12165, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." § 12132. The question presented in this case is whether Title II exceeds Congress' power under § 5 of the Fourteenth Amendment.

## I

In August 1998, respondents George Lane and Beverly Jones filed this action against the State of Tennessee and a number of Tennessee counties, alleging past and ongoing violations of Title II. Respondents, both of whom are paraplegics who use wheelchairs for mobility, claimed that they were denied access to, and the services of, the state court system by reason of their disabilities. Lane alleged that he was compelled to appear to answer a set of criminal charges on the second floor of a county courthouse that had no eleva-

eral of Delaware; for the State of Minnesota et al. by *Mike Hatch,* Attorney General of Minnesota, and *Gary R. Cunningham* and *Kristyn Anderson,* Assistant Attorneys General, and by the Attorneys General for their respective States as follows: *Richard Blumenthal* of Connecticut, *Lisa Madigan* of Illinois, *Thomas F. Reilly* of Massachusetts, *Jeremiah W. (Jay) Nixon* of Missouri, *Patricia A. Madrid* of New Mexico, *Eliot Spitzer* of New York, *William H. Sorrell* of Vermont, *Christine O. Gregoire* of Washington, and *Peggy A. Lautenschlager* of Wisconsin; for the American Bar Association by *Dennis W. Archer* and *Paul R. Q. Wolfson;* for the Blanche Fischer Foundation by *Sherril Nell Babcock;* for the Lawyers' Committee for Civil Rights Under Law et al. by *Charles Lester, Jr., Deborah M. Danzig, Barbara R. Arnwine, Thomas J. Henderson, Michael L. Foreman, Kristin M. Dadey, Vincent A. Eng, Dennis C. Hayes, Elliot Mincberg,* and *Michael Lieberman;* for Paralyzed Veterans of America et al. by *Timothy K. Armstrong, Elizabeth B. McCallum, Ira A. Burnim,* and *Jennifer Mathis;* and for the Honorable Dick Thornburgh et al. by *Arlene B. Mayerson, Claudia Center,* and *Elizabeth Kristen.*

tor. At his first appearance, Lane crawled up two flights of stairs to get to the courtroom. When Lane returned to the courthouse for a hearing, he refused to crawl again or to be carried by officers to the courtroom; he consequently was arrested and jailed for failure to appear. Jones, a certified court reporter, alleged that she has not been able to gain access to a number of county courthouses, and, as a result, has lost both work and an opportunity to participate in the judicial process. Respondents sought damages and equitable relief.

The State moved to dismiss the suit on the ground that it was barred by the Eleventh Amendment. The District Court denied the motion without opinion, and the State appealed.[1] The United States intervened to defend Title II's abrogation of the States' Eleventh Amendment immunity. On April 28, 2000, after the appeal had been briefed and argued, the Court of Appeals for the Sixth Circuit entered an order holding the case in abeyance pending our decision in *Board of Trustees of Univ. of Ala.* v. *Garrett,* 531 U. S. 356 (2001).

In *Garrett,* we concluded that the Eleventh Amendment bars private suits seeking money damages for state violations of Title I of the ADA. We left open, however, the question whether the Eleventh Amendment permits suits for money damages under Title II. *Id.,* at 360, n. 1. Following the *Garrett* decision, the Court of Appeals, sitting en banc, heard argument in a Title II suit brought by a hearing-impaired litigant who sought money damages for the State's failure to accommodate his disability in a child custody proceeding. *Popovich* v. *Cuyahoga County Court,* 276 F. 3d 808 (CA6 2002). A divided court permitted the suit to proceed

---

[1] In *Puerto Rico Aqueduct and Sewer Authority* v. *Metcalf & Eddy, Inc.,* 506 U. S. 139 (1993), we held that "States and state entities that claim to be 'arms of the State' may take advantage of the collateral order doctrine to appeal a district court order denying a claim of Eleventh Amendment immunity." *Id.,* at 147.

despite the State's assertion of Eleventh Amendment immunity. The majority interpreted *Garrett* to bar private ADA suits against States based on equal protection principles, but not those that rely on due process principles. 276 F. 3d, at 811–816. The minority concluded that Congress had not validly abrogated the States' Eleventh Amendment immunity for any Title II claims, *id.*, at 821, while the concurring opinion concluded that Title II validly abrogated state sovereign immunity with respect to both equal protection and due process claims, *id.*, at 818.

Following the en banc decision in *Popovich*, a panel of the Court of Appeals entered an order affirming the District Court's denial of the State's motion to dismiss in this case. Judgt. order reported at 40 Fed. Appx. 911 (CA6 2002). The order explained that respondents' claims were not barred because they were based on due process principles. In response to a petition for rehearing arguing that *Popovich* was not controlling because the complaint did not allege due process violations, the panel filed an amended opinion. It explained that the Due Process Clause protects the right of access to the courts, and that the evidence before Congress when it enacted Title II "established that physical barriers in government buildings, including courthouses and in the courtrooms themselves, have had the effect of denying disabled people the opportunity to access vital services and to exercise fundamental rights guaranteed by the Due Process Clause." 315 F. 3d 680, 682 (2003). Moreover, that "record demonstrated that public entities' failure to accommodate the needs of qualified persons with disabilities may result directly from unconstitutional animus and impermissible stereotypes." *Id.*, at 683. The panel did not, however, categorically reject the State's submission. It instead noted that the case presented difficult questions that "cannot be clarified absent a factual record," and remanded for further proceedings. *Ibid.* We granted certiorari, 539 U. S. 941 (2003), and now affirm.

## II

The ADA was passed by large majorities in both Houses of Congress after decades of deliberation and investigation into the need for comprehensive legislation to address discrimination against persons with disabilities. In the years immediately preceding the ADA's enactment, Congress held 13 hearings and created a special task force that gathered evidence from every State in the Union. The conclusions Congress drew from this evidence are set forth in the task force and Committee Reports, described in lengthy legislative hearings, and summarized in the preamble to the statute.[2] Central among these conclusions was Congress' finding that

> "individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society." 42 U. S. C. § 12101(a)(7).

Invoking "the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce," the ADA is designed "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." §§ 12101(b)(1), (b)(4). It forbids discrimination against persons with disabilities in three major areas of public life: employment, which is covered by Title I of the statute; public

---

[2] See 42 U. S. C. § 12101; Task Force on the Rights and Empowerment of Americans with Disabilities, From ADA to Empowerment 16 (Oct. 12, 1990); S. Rep. No. 101–116 (1989); H. R. Rep. No. 101–485 (1990); H. R. Conf. Rep. No. 101–558 (1990); H. R. Conf. Rep. No. 101–596 (1990); cf. *Board of Trustees of Univ. of Ala.* v. *Garrett*, 531 U. S. 356, 389–390 (2001) (App. A to opinion of BREYER, J., dissenting) (listing congressional hearings).

services, programs, and activities, which are the subject of Title II; and public accommodations, which are covered by Title III.

Title II, §§ 12131–12134, prohibits any public entity from discriminating against "qualified" persons with disabilities in the provision or operation of public services, programs, or activities. The Act defines the term "public entity" to include state and local governments, as well as their agencies and instrumentalities. § 12131(1). Persons with disabilities are "qualified" if they, "with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, mee[t] the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." § 12131(2). Title II's enforcement provision incorporates by reference § 505 of the Rehabilitation Act of 1973, 92 Stat. 2982, as added, 29 U. S. C. § 794a, which authorizes private citizens to bring suits for money damages. 42 U. S. C. § 12133.

## III

The Eleventh Amendment renders the States immune from "any suit in law or equity, commenced or prosecuted . . . by Citizens of another State, or by Citizens or Subjects of any Foreign State." Even though the Amendment "by its terms . . . applies only to suits against a State by citizens of another State," our cases have repeatedly held that this immunity also applies to unconsented suits brought by a State's own citizens. *Garrett*, 531 U. S., at 363; *Kimel* v. *Florida Bd. of Regents*, 528 U. S. 62, 72–73 (2000). Our cases have also held that Congress may abrogate the State's Eleventh Amendment immunity. To determine whether it has done so in any given case, we "must resolve two predicate questions: first, whether Congress unequivocally expressed its intent to abrogate that immunity; and second, if it did, whether Congress acted pursuant to a valid grant of constitutional authority." *Id.*, at 73.

The first question is easily answered in this case. The Act specifically provides: "A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." 42 U. S. C. § 12202. As in *Garrett,* see 531 U. S., at 363–364, no party disputes the adequacy of that expression of Congress' intent to abrogate the States' Eleventh Amendment immunity. The question, then, is whether Congress had the power to give effect to its intent.

In *Fitzpatrick* v. *Bitzer,* 427 U. S. 445 (1976), we held that Congress can abrogate a State's sovereign immunity when it does so pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment to enforce the substantive guarantees of that Amendment. *Id.,* at 456. This enforcement power, as we have often acknowledged, is a "broad power indeed." *Mississippi Univ. for Women* v. *Hogan,* 458 U. S. 718, 732 (1982), citing *Ex parte Virginia,* 100 U. S. 339, 346 (1880).[3] It includes "the authority both to remedy and to deter violation of rights guaranteed [by the Fourteenth Amendment] by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." *Kimel,* 528 U. S., at 81. We have thus repeatedly affirmed that "Congress may enact so-called prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct." *Nevada Dept. of Human Resources* v. *Hibbs,* 538 U. S. 721, 727–728 (2003). See also *City of Boerne* v. *Flores,*

---

[3] In *Ex parte Virginia,* we described the breadth of Congress' § 5 power as follows:

"Whatever legislation is appropriate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power." 100 U. S., at 345–346. See also *City of Boerne* v. *Flores,* 521 U. S. 507, 517–518 (1997).

521 U. S. 507, 518 (1997).[4] The most recent affirmation of the breadth of Congress' § 5 power came in *Hibbs*, in which we considered whether a male state employee could recover money damages against the State for its failure to comply with the family-care leave provision of the Family and Medical Leave Act of 1993 (FMLA), 107 Stat. 6, 29 U. S. C. § 2601 *et seq.* We upheld the FMLA as a valid exercise of Congress' § 5 power to combat unconstitutional sex discrimination, even though there was no suggestion that the State's leave policy was adopted or applied with a discriminatory purpose that would render it unconstitutional under the rule of *Personnel Administrator of Mass.* v. *Feeney,* 442 U. S. 256

---

[4] In *Boerne,* we observed:

"Legislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the States.' *Fitzpatrick* v. *Bitzer,* 427 U. S. 445, 455 (1976). For example, the Court upheld a suspension of literacy tests and similar voting requirements under Congress' parallel power to enforce the provisions of the Fifteenth Amendment, see U. S. Const., Amdt. 15, § 2, as a measure to combat racial discrimination in voting, *South Carolina* v. *Katzenbach,* 383 U. S. 301, 308 (1966), despite the facial constitutionality of the tests under *Lassiter* v. *Northampton County Bd. of Elections,* 360 U. S. 45 (1959). We have also concluded that other measures protecting voting rights are within Congress' power to enforce the Fourteenth and Fifteenth Amendments, despite the burdens those measures placed on the States. *South Carolina* v. *Katzenbach, supra* (upholding several provisions of the Voting Rights Act of 1965); *Katzenbach* v. *Morgan,* [384 U. S. 641 (1966)] (upholding ban on literacy tests that prohibited certain people schooled in Puerto Rico from voting); *Oregon* v. *Mitchell,* 400 U. S. 112 (1970) (upholding 5-year nationwide ban on literacy tests and similar voting requirements for registering to vote); *City of Rome* v. *United States,* 446 U. S. 156, 161 (1980) (upholding 7-year extension of the Voting Rights Act's requirement that certain jurisdictions preclear any change to a ' "standard, practice, or procedure with respect to voting" '); see also *James Everard's Breweries* v. *Day,* 265 U. S. 545 (1924) (upholding ban on medical prescription of intoxicating malt liquors as appropriate to enforce Eighteenth Amendment ban on manufacture, sale, or transportation of intoxicating liquors for beverage purposes)." *Id.,* at 518.

(1979). When Congress seeks to remedy or prevent unconstitutional discrimination, § 5 authorizes it to enact prophylactic legislation proscribing practices that are discriminatory in effect, if not in intent, to carry out the basic objectives of the Equal Protection Clause.

Congress' § 5 power is not, however, unlimited. While Congress must have a wide berth in devising appropriate remedial and preventative measures for unconstitutional actions, those measures may not work a "substantive change in the governing law." *Boerne*, 521 U. S., at 519. In *Boerne*, we recognized that the line between remedial legislation and substantive redefinition is "not easy to discern," and that "Congress must have wide latitude in determining where it lies." *Id.*, at 519–520. But we also confirmed that "the distinction exists and must be observed," and set forth a test for so observing it: Section 5 legislation is valid if it exhibits "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.*, at 520.

In *Boerne*, we held that Congress had exceeded its § 5 authority when it enacted the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, 42 U. S. C. § 2000bb *et seq.* We began by noting that Congress enacted RFRA "in direct response" to our decision in *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872 (1990), for the stated purpose of "restor[ing]" a constitutional rule that *Smith* had rejected. 521 U. S., at 512, 515 (internal quotation marks omitted). Though the respondent attempted to defend the statute as a reasonable means of enforcing the Free Exercise Clause as interpreted in *Smith*, we concluded that RFRA was "so out of proportion" to that objective that it could be understood only as an attempt to work a "substantive change in constitutional protections." 521 U. S., at 529, 532. Indeed, that was the very purpose of the law.

This Court further defined the contours of *Boerne*'s "congruence and proportionality" test in *Florida Prepaid Post-*

*secondary Ed. Expense Bd.* v. *College Savings Bank*, 527 U. S. 627 (1999). At issue in that case was the validity of the Patent and Plant Variety Protection Remedy Clarification Act (hereinafter Patent Remedy Act), a statutory amendment Congress enacted in the wake of our decision in *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234 (1985), to clarify its intent to abrogate state sovereign immunity from patent infringement suits. *Florida Prepaid*, 527 U. S., at 631–632. Noting the virtually complete absence of a history of unconstitutional patent infringement on the part of the States, as well as the Act's expansive coverage, the Court concluded that the Patent Remedy Act's apparent aim was to serve the Article I concerns of "provid[ing] a uniform remedy for patent infringement and . . . plac[ing] States on the same footing as private parties under that regime," and not to enforce the guarantees of the Fourteenth Amendment. *Id.*, at 647–648. See also *Kimel*, 528 U. S. 62 (finding that the Age Discrimination in Employment Act exceeded Congress' § 5 powers under *Boerne*); *United States* v. *Morrison*, 529 U. S. 598 (2000) (Violence Against Women Act).

Applying the *Boerne* test in *Garrett*, we concluded that Title I of the ADA was not a valid exercise of Congress' § 5 power to enforce the Fourteenth Amendment's prohibition on unconstitutional disability discrimination in public employment. As in *Florida Prepaid*, we concluded Congress' exercise of its prophylactic § 5 power was unsupported by a relevant history and pattern of constitutional violations. 531 U. S., at 368, 374. Although the dissent pointed out that Congress had before it a great deal of evidence of discrimination by the States against persons with disabilities, *id.*, at 379 (opinion of BREYER, J.), the Court's opinion noted that the "overwhelming majority" of that evidence related to "the provision of public services and public accommodations, which areas are addressed in Titles II and III," rather than Title I, *id.*, at 371, n. 7. We also noted that neither the ADA's legislative findings nor its legislative history reflected a concern that the States had been engaging in a pattern of

unconstitutional employment discrimination. We emphasized that the House and Senate Committee Reports on the ADA focused on " '[d]iscrimination [in] . . . *employment in the private sector,*' " and made no mention of discrimination in public employment. *Id.,* at 371–372 (quoting S. Rep. No. 101–116, p. 6 (1989), and H. R. Rep. No. 101–485, pt. 2, p. 28 (1990)) (emphasis in *Garrett*). Finally, we concluded that Title I's broad remedial scheme was insufficiently targeted to remedy or prevent unconstitutional discrimination in public employment. Taken together, the historical record and the broad sweep of the statute suggested that Title I's true aim was not so much to enforce the Fourteenth Amendment's prohibitions against disability discrimination in public employment as it was to "rewrite" this Court's Fourteenth Amendment jurisprudence. 531 U. S., at 372–374.

In view of the significant differences between Titles I and II, however, *Garrett* left open the question whether Title II is a valid exercise of Congress' § 5 enforcement power. It is to that question that we now turn.

## IV

The first step of the *Boerne* inquiry requires us to identify the constitutional right or rights that Congress sought to enforce when it enacted Title II. *Garrett,* 531 U. S., at 365. In *Garrett* we identified Title I's purpose as enforcement of the Fourteenth Amendment's command that "all persons similarly situated should be treated alike." *Cleburne* v. *Cleburne Living Center, Inc.,* 473 U. S. 432, 439 (1985). As we observed, classifications based on disability violate that constitutional command if they lack a rational relationship to a legitimate governmental purpose. *Garrett,* 531 U. S., at 366 (citing *Cleburne,* 473 U. S., at 446).

Title II, like Title I, seeks to enforce this prohibition on irrational disability discrimination. But it also seeks to enforce a variety of other basic constitutional guarantees, infringements of which are subject to more searching judicial

review. See, *e. g., Dunn* v. *Blumstein,* 405 U. S. 330, 336–337 (1972); *Shapiro* v. *Thompson,* 394 U. S. 618, 634 (1969); *Skinner* v. *Oklahoma ex rel. Williamson,* 316 U. S. 535, 541 (1942). These rights include some, like the right of access to the courts at issue in this case, that are protected by the Due Process Clause of the Fourteenth Amendment. The Due Process Clause and the Confrontation Clause of the Sixth Amendment, as applied to the States via the Fourteenth Amendment, both guarantee to a criminal defendant such as respondent Lane the "right to be present at. all stages of the trial where his absence might frustrate the fairness of the proceedings." *Faretta* v. *California,* 422 U. S. 806, 819, n. 15 (1975). The Due Process Clause also requires the States to afford certain civil litigants a "meaningful opportunity to be heard" by removing obstacles to their full participation in judicial proceedings. *Boddie* v. *Connecticut,* 401 U. S. 371, 379 (1971); *M. L. B.* v. *S. L. J.,* 519 U. S. 102 (1996). We have held that the Sixth Amendment guarantees to criminal defendants the right to trial by a jury composed of a fair cross section of the community, noting that the exclusion of "identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial." *Taylor* v. *Louisiana,* 419 U. S. 522, 530 (1975). And, finally, we have recognized that members of the public have a right of access to criminal proceedings secured by the First Amendment. *Press-Enterprise Co.* v. *Superior Court of Cal., County of Riverside,* 478 U. S. 1, 8–15 (1986).

Whether Title II validly enforces these constitutional rights is a question that "must be judged with reference to the historical experience which it reflects." *South Carolina* v. *Katzenbach,* 383 U. S. 301, 308 (1966). See also *Florida Prepaid,* 527 U. S., at 639–640; *Boerne,* 521 U. S., at 530. While § 5 authorizes Congress to enact reasonably prophylactic remedial legislation, the appropriateness of the remedy depends on the gravity of the harm it seeks to prevent.

"Difficult and intractable problems often require powerful remedies," *Kimel,* 528 U. S., at 88, but it is also true that "[s]trong measures appropriate to address one harm may be an unwarranted response to another, lesser one," *Boerne,* 521 U. S., at 530.

It is not difficult to perceive the harm that Title II is designed to address. Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights. For example, "[a]s of 1979, most States . . . categorically disqualified 'idiots' from voting, without regard to individual capacity."[5] The majority of these laws remain on the books,[6] and have been the subject of legal challenge as recently as 2001.[7] Similarly, a number of States have prohibited and continue to prohibit persons with disabilities from engaging in activities such as marrying[8] and serving as jurors.[9] The historical experience that Title II reflects is also documented in this Court's cases, which have identified unconstitutional treatment of disabled

---

[5] *Cleburne* v. *Cleburne Living Center, Inc.,* 473 U. S. 432, 464, and n. 14 (1985) (Marshall, J., concurring in judgment in part and dissenting in part) (citing Note, Mental Disability and the Right to Vote, 88 Yale L. J. 1644 (1979)).

[6] See Schriner, Ochs, & Shields, Democratic Dilemmas: Notes on the ADA and Voting Rights of People with Cognitive and Emotional Impairments, 21 Berkeley J. Emp. & Lab. L. 437, 456–472, tbl. II (2000) (listing state laws concerning the voting rights of persons with mental disabilities).

[7] See *Doe* v. *Rowe,* 156 F. Supp. 2d 35 (Me. 2001).

[8] *E. g.,* D. C. Code § 46–403 (West 2001) (declaring illegal and void the marriage of "an idiot or of a person adjudged to be a lunatic"); Ky. Rev. Stat. Ann. § 402.990(2) (West 1992 Cumulative Service) (criminalizing the marriage of persons with mental disabilities); Tenn. Code Ann. § 36–3–109 (1996) (forbidding the issuance of a marriage license to "imbecile[s]").

[9] *E. g.,* Mich. Comp. Laws Ann. § 729.204 (West 2002) (persons selected for inclusion on jury list may not be "infirm or decrepit"); Tenn. Code Ann. § 22–2–304(c) (1994) (authorizing judges to excuse "mentally and physically disabled" persons from jury service).

persons by state agencies in a variety of settings, including unjustified commitment, *e. g.*, *Jackson* v. *Indiana*, 406 U. S. 715 (1972); the abuse and neglect of persons committed to state mental health hospitals, *Youngberg* v. *Romeo*, 457 U. S. 307 (1982);[10] and irrational discrimination in zoning decisions, *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432 (1985). The decisions of other courts, too, document a pattern of unequal treatment in the administration of a wide range of public services, programs, and activities, including the penal system,[11] public education,[12] and voting.[13] Notably, these decisions also demonstrate a pattern of unconstitutional treatment in the administration of justice.[14]

---

[10] The undisputed findings of fact in *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1 (1981), provide another example of such mistreatment. See *id.*, at 7 ("Conditions at Pennhurst are not only dangerous, with the residents often physically abused or drugged by staff members, but also inadequate for the 'habilitation' of the retarded").

[11] *E. g.*, *LaFaut* v. *Smith*, 834 F. 2d 389, 394 (CA4 1987) (paraplegic inmate unable to access toilet facilities); *Schmidt* v. *Odell*, 64 F. Supp. 2d 1014 (Kan. 1999) (double amputee forced to crawl around the floor of jail). See also, *e. g.*, *Key* v. *Grayson*, 179 F. 3d 996 (CA6 1999) (deaf inmate denied access to sex offender therapy program allegedly required as precondition for parole).

[12] *E. g.*, *New York State Assn. for Retarded Children, Inc.* v. *Carey*, 466 F. Supp. 487, 504 (EDNY 1979) (segregation of mentally retarded students with hepatitis B); *Mills* v. *Board of Ed. of District of Columbia*, 348 F. Supp. 866 (DC 1972) (exclusion of mentally retarded students from public school system). See also, *e. g.*, *Robertson* v. *Granite City Community Unit School Dist. No. 9*, 684 F. Supp. 1002 (SD Ill. 1988) (elementary-school student with AIDS excluded from attending regular education classes or participating in extracurricular activities); *Thomas* v. *Atascadero Unified School Dist.*, 662 F. Supp. 376 (CD Cal. 1986) (kindergarten student with AIDS excluded from class).

[13] *E. g.*, *Doe* v. *Rowe*, 156 F. Supp. 2d 35 (Me. 2001) (disenfranchisement of persons under guardianship by reason of mental illness). See also, *e. g.*, *New York ex rel. Spitzer* v. *County of Delaware*, 82 F. Supp. 2d 12 (NDNY 2000) (mobility-impaired voters unable to access county polling places).

[14] *E. g.*, *Ferrell* v. *Estelle*, 568 F. 2d 1128, 1132–1133 (CA5) (deaf criminal defendant denied interpretive services), opinion withdrawn as moot, 573 F. 2d 867 (1978); *State* v. *Schaim*, 65 Ohio St. 3d 51, 64, 600 N. E. 2d 661,

This pattern of disability discrimination persisted despite several federal and state legislative efforts to address it. In the deliberations that led up to the enactment of the ADA, Congress identified important shortcomings in existing laws that rendered them "inadequate to address the pervasive problems of discrimination that people with disabilities are facing." S. Rep. No. 101–116, at 18. See also H. R. Rep. No. 101–485, pt. 2, at 47.[15] It also uncovered further evidence of those shortcomings, in the form of hundreds of examples of unequal treatment of persons with disabilities by States and their political subdivisions. See *Garrett*, 531 U. S., at 379 (BREYER, J., dissenting). See also *id.*, at 391 (App. C to opinion of BREYER, J., dissenting). As the Court's opinion in *Garrett* observed, the "overwhelming majority" of these examples concerned discrimination in the administration of public programs and services. *Id.*, at 371, n. 7; Government's Lodging in *Garrett*, O. T. 2000, No. 99–1240 (available in Clerk of Court's case file).

---

672 (1992) (same); *People* v. *Rivera*, 125 Misc. 2d 516, 528, 480 N. Y. S. 2d 426, 434 (Sup. Ct. 1984) (same). See also, *e. g., Layton* v. *Elder*, 143 F. 3d 469, 470–472 (CA8 1998) (mobility-impaired litigant excluded from a county quorum court session held on the second floor of an inaccessible courthouse); *Matthews* v. *Jefferson*, 29 F. Supp. 2d 525, 533–534 (WD Ark. 1998) (wheelchair-bound litigant had to be carried to the second floor of an inaccessible courthouse, from which he was unable to leave to use restroom facilities or obtain a meal, and no arrangements were made to carry him downstairs at the end of the day); *Pomerantz* v. *County of Los Angeles*, 674 F. 2d 1288, 1289 (CA9 1982) (blind persons categorically excluded from jury service); *Galloway* v. *Superior Court of District of Columbia*, 816 F. Supp. 12 (DC 1993) (same); *DeLong* v. *Brumbaugh*, 703 F. Supp. 399, 405 (WD Pa. 1989) (deaf individual excluded from jury service); *People* v. *Green*, 148 Misc. 2d 666, 669, 561 N. Y. S. 2d 130, 133 (Cty. Ct. 1990) (prosecutor exercised peremptory strike against prospective juror solely because she was hearing impaired).

[15] For a comprehensive discussion of the shortcomings of state disability discrimination statutes, see Colker & Milani, The Post-*Garrett* World: Insufficient State Protection against Disability Discrimination, 53 Ala. L. Rev. 1075 (2002).

With respect to the particular services at issue in this case, Congress learned that many individuals, in many States across the country, were being excluded from courthouses and court proceedings by reason of their disabilities. A report before Congress showed that some 76% of public services and programs housed in state-owned buildings were inaccessible to and unusable by persons with disabilities, even taking into account the possibility that the services and programs might be restructured or relocated to other parts of the buildings. U. S. Commission on Civil Rights, Accommodating the Spectrum of Individual Abilities 39 (1983). Congress itself heard testimony from persons with disabilities who described the physical inaccessibility of local courthouses. Oversight Hearing on H. R. 4498 before the House Subcommittee on Select Education of the Committee on Education and Labor, 100th Cong., 2d Sess., 40–41, 48 (1988). And its appointed task force heard numerous examples of the exclusion of persons with disabilities from state judicial services and programs, including exclusion of persons with visual impairments and hearing impairments from jury service, failure of state and local governments to provide interpretive services for the hearing impaired, failure to permit the testimony of adults with developmental disabilities in abuse cases, and failure to make courtrooms accessible to witnesses with physical disabilities. Government's Lodging in *Garrett*, O. T. 2000, No. 99–1240. See also Task Force on the Rights and Empowerment of Americans with Disabilities, From ADA to Empowerment (Oct. 12, 1990).[16]

---

[16] THE CHIEF JUSTICE dismisses as "irrelevant" the portions of this evidence that concern the conduct of nonstate governments. *Post,* at 542–543 (dissenting opinion). This argument rests on the mistaken premise that a valid exercise of Congress' §5 power must always be predicated solely on evidence of constitutional violations by the States themselves. To operate on that premise in this case would be particularly inappropriate because this case concerns the provision of judicial services, an area in which local governments are typically treated as "arm[s] of the State" for Eleventh Amendment purposes, *Mt. Healthy City Bd. of Ed.* v. *Doyle,* 429

Given the sheer volume of evidence demonstrating the nature and extent of unconstitutional discrimination against persons with disabilities in the provision of public services, the dissent's contention that the record is insufficient to justify Congress' exercise of its prophylactic power is puzzling, to say the least. Just last Term in *Hibbs*, we approved the family-care leave provision of the FMLA as valid § 5 legislation based primarily on evidence of disparate provision of parenting leave, little of which concerned unconstitutional state conduct. 538 U. S., at 728–733.[17] We explained that

U. S. 274, 280 (1977), and thus enjoy precisely the same immunity from unconsented suit as the States. See, *e. g., Callahan* v. *Philadelphia,* 207 F. 3d 668, 670–674 (CA3 2000) (municipal court is an "arm of the State" entitled to Eleventh Amendment immunity); *Kelly* v. *Municipal Courts,* 97 F. 3d 902, 907–908 (CA7 1996) (same); *Franceschi* v. *Schwartz,* 57 F. 3d 828, 831 (CA9 1995) (same). Cf. *Garrett,* 531 U. S., at 368–369.

In any event, our cases have recognized that evidence of constitutional violations on the part of nonstate governmental actors is relevant to the § 5 inquiry. To be sure, evidence of constitutional violations by the States themselves is particularly important when, as in *Florida Prepaid Postsecondary Ed. Expense Bd.* v. *College Savings Bank,* 527 U. S. 627 (1999), *Kimel* v. *Florida Bd. of Regents,* 528 U. S. 62 (2000), and *Garrett,* the sole purpose of reliance on § 5 is to place the States on equal footing with private actors with respect to their amenability to suit. But much of the evidence in *South Carolina* v. *Katzenbach,* 383 U. S. 301, 312–315 (1966), to which THE CHIEF JUSTICE favorably refers, *post,* at 548, involved the conduct of county and city officials, rather than the States. Moreover, what THE CHIEF JUSTICE calls an "extensive legislative record documenting States' gender discrimination in employment leave policies" in *Nevada Dept. of Human Resources* v. *Hibbs,* 538 U. S. 721 (2003), *post,* at 548, in fact contained little specific evidence of a pattern of unconstitutional discrimination on the part of the States. Indeed, the evidence before the Congress that enacted the FMLA related primarily to the practices of private-sector employers and the Federal Government. See *Hibbs,* 538 U. S., at 730–735. See also *id.,* at 745–750 (KENNEDY, J., dissenting).

[17] Specifically, we relied on (1) a Senate Report citation to a Bureau of Labor Statistics survey revealing disparities in private-sector provision of parenting leave to men and women; (2) submissions from two sources at a hearing on the Parental and Medical Leave Act of 1986, a predecessor bill

because the FMLA was targeted at sex-based classifications, which are subject to a heightened standard of judicial scrutiny, "it was easier for Congress to show a pattern of state constitutional violations" than in *Garrett* or *Kimel,* both of which concerned legislation that targeted classifications subject to rational-basis review. 538 U. S., at 735–737. Title II is aimed at the enforcement of a variety of basic rights, including the right of access to the courts at issue in this case, that call for a standard of judicial review at least as searching, and in some cases more searching, than the standard that applies to sex-based classifications. And in any event, the record of constitutional violations in this case—including judicial findings of unconstitutional state action, and statistical, legislative, and anecdotal evidence of the widespread exclusion of persons with disabilities from the enjoyment of public services—far exceeds the record in *Hibbs.*

The conclusion that Congress drew from this body of evidence is set forth in the text of the ADA itself: "[D]iscrimination against individuals with disabilities persists in such critical areas as . . . education, transportation, communication, recreation, institutionalization, health services, voting, and *access to public services.*" 42 U. S. C. § 12101(a)(3) (emphasis added). This finding, together with the extensive record of disability discrimination that underlies it, makes clear beyond peradventure that inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation.

---

to the FMLA, that public-sector parental leave polices "'diffe[r] little'" from private-sector policies; (3) evidence that 15 States provided women up to one year of extended maternity leave, while only 4 States provided for similarly extended paternity leave; and (4) a House Report's quotation of a study that found that failure to implement uniform standards for parenting leave would "'leav[e] Federal employees open to discretionary and possibly unequal treatment,'" H. R. Rep. No. 103–8, pt. 2, p. 11 (1993). *Hibbs,* 538 U. S., at 728–733.

## V

The only question that remains is whether Title II is an appropriate response to this history and pattern of unequal treatment. At the outset, we must determine the scope of that inquiry. Title II—unlike RFRA, the Patent Remedy Act, and the other statutes we have reviewed for validity under §5—reaches a wide array of official conduct in an effort to enforce an equally wide array of constitutional guarantees. Petitioner urges us both to examine the broad range of Title II's applications all at once, and to treat that breadth as a mark of the law's invalidity. According to petitioner, the fact that Title II applies not only to public education and voting-booth access but also to seating at state-owned hockey rinks indicates that Title II is not appropriately tailored to serve its objectives. But nothing in our case law requires us to consider Title II, with its wide variety of applications, as an undifferentiated whole.[18] Whatever might be said about Title II's other applications, the question presented in this case is not whether Congress can

---

[18] Contrary to THE CHIEF JUSTICE, *post,* at 551–552, neither *Garrett* nor *Florida Prepaid* lends support to the proposition that the *Boerne* test requires courts in all cases to "measur[e] the full breadth of the statute or relevant provision that Congress enacted against the scope of the constitutional right it purported to enforce." In fact, the decision in *Garrett,* which severed Title I of the ADA from Title II for purposes of the §5 inquiry, demonstrates that courts need not examine "the full breadth of the statute" all at once. Moreover, *Garrett* and *Florida Prepaid,* like all of our other recent §5 cases, concerned legislation that narrowly targeted the enforcement of a single constitutional right; for that reason, neither speaks to the issue presented in this case.

Nor is THE CHIEF JUSTICE's approach compelled by the nature of the *Boerne* inquiry. The answer to the question *Boerne* asks—whether a piece of legislation attempts substantively to redefine a constitutional guarantee—logically focuses on the manner in which the legislation operates to enforce that particular guarantee. It is unclear what, if anything, examining Title II's application to hockey rinks or voting booths can tell us about whether Title II substantively redefines the right of access to the courts.

validly subject the States to private suits for money damages for failing to provide reasonable access to hockey rinks, or even to voting booths, but whether Congress had the power under § 5 to enforce the constitutional right of access to the courts. Because we find that Title II unquestionably is valid § 5 legislation as it applies to the class of cases implicating the accessibility of judicial services, we need go no further. See *United States* v. *Raines*, 362 U. S. 17, 26 (1960).[19]

Congress' chosen remedy for the pattern of exclusion and discrimination described above, Title II's requirement of program accessibility, is congruent and proportional to its object of enforcing the right of access to the courts. The unequal treatment of disabled persons in the administration of judicial services has a long history, and has persisted despite several legislative efforts to remedy the problem of disability discrimination. Faced with considerable evidence of the shortcomings of previous legislative responses, Congress was justified in concluding that this "difficult and intractable proble[m]" warranted "added prophylactic measures in response." *Hibbs*, 538 U. S., at 737 (internal quotation marks omitted).

The remedy Congress chose is nevertheless a limited one. Recognizing that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion, Congress required the States to take reasonable measures to remove architectural and other barriers to accessibility. 42 U. S. C. § 12131(2). But Title II does not require States to employ any and all means to make judicial

---

[19] In *Raines*, a State subject to suit under the Civil Rights Act of 1957 contended that the law exceeded Congress' power to enforce the Fifteenth Amendment because it prohibited "any person," and not just state actors, from interfering with voting rights. We rejected that argument, concluding that "if the complaint here called for an application of the statute clearly constitutional under the Fifteenth Amendment, that should have been an end to the question of constitutionality." 362 U. S., at 24–25.

services accessible to persons with disabilities, and it does not require States to compromise their essential eligibility criteria for public programs. It requires only "reasonable modifications" that would not fundamentally alter the nature of the service provided, and only when the individual seeking modification is otherwise eligible for the service. *Ibid.* As Title II's implementing regulations make clear, the reasonable modification requirement can be satisfied in a number of ways. In the case of facilities built or altered after 1992, the regulations require compliance with specific architectural accessibility standards. 28 CFR § 35.151 (2003). But in the case of older facilities, for which structural change is likely to be more difficult, a public entity may comply with Title II by adopting a variety of less costly measures, including relocating services to alternative, accessible sites and assigning aides to assist persons with disabilities in accessing services. § 35.150(b)(1). Only if these measures are ineffective in achieving accessibility is the public entity required to make reasonable structural changes. *Ibid.* And in no event is the entity required to undertake measures that would impose an undue financial or administrative burden, threaten historic preservation interests, or effect a fundamental alteration in the nature of the service. §§ 35.150(a)(2), (a)(3).

This duty to accommodate is perfectly consistent with the well-established due process principle that, "within the limits of practicability, a State must afford to all individuals a meaningful opportunity to be heard" in its courts. *Boddie,* 401 U. S., at 379 (internal quotation marks and citation omitted).[20] Our cases have recognized a number of affirmative obligations that flow from this principle: the duty to waive

---

[20] Because this case implicates the right of access to the courts, we need not consider whether Title II's duty to accommodate exceeds what the Constitution requires in the class of cases that implicate only *Cleburne's* prohibition on irrational discrimination. See *Garrett,* 531 U. S., at 372.

filing fees in certain family-law and criminal cases,[21] the duty to provide transcripts to criminal defendants seeking review of their convictions,[22] and the duty to provide counsel to certain criminal defendants.[23] Each of these cases makes clear that ordinary considerations of cost and convenience alone cannot justify a State's failure to provide individuals with a meaningful right of access to the courts. Judged against this backdrop, Title II's affirmative obligation to accommodate persons with disabilities in the administration of justice cannot be said to be "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *Boerne*, 521 U. S., at 532; *Kimel*, 528 U. S., at 86.[24] It is, rather, a reasonable prophylactic measure, reasonably targeted to a legitimate end.

For these reasons, we conclude that Title II, as it applies to the class of cases implicating the fundamental right of ac-

---

[21] *Boddie* v. *Connecticut*, 401 U. S. 371 (1971) (divorce filing fee); *M. L. B.* v. *S. L. J.*, 519 U. S. 102 (1996) (record fee in parental rights termination action); *Smith* v. *Bennett*, 365 U. S. 708 (1961) (filing fee for habeas petitions); *Burns* v. *Ohio*, 360 U. S. 252 (1959) (filing fee for direct appeal in criminal case).

[22] *Griffin* v. *Illinois*, 351 U. S. 12 (1956).

[23] *Gideon* v. *Wainwright*, 372 U. S. 335 (1963) (trial counsel for persons charged with felony offenses); *Douglas* v. *California*, 372 U. S. 353 (1963) (counsel for direct appeals as of right).

[24] THE CHIEF JUSTICE contends that Title II cannot be understood as remedial legislation because it "subjects a State to liability for failing to make a vast array of special accommodations, *without regard for whether the failure to accommodate results in a constitutional wrong.*" *Post*, at 553 (emphasis in original). But as we have often acknowledged, Congress "is not confined to the enactment of legislation that merely parrots the precise wording of the Fourteenth Amendment," and may prohibit "a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." *Kimel*, 528 U. S., at 81. Cf. *Hibbs*, 538 U. S. 721 (upholding the FMLA as valid remedial legislation without regard to whether failure to provide the statutorily mandated 12 weeks' leave results in a violation of the Fourteenth Amendment).

cess to the courts, constitutes a valid exercise of Congress' §5 authority to enforce the guarantees of the Fourteenth Amendment. The judgment of the Court of Appeals is therefore affirmed.

*It is so ordered.*

JUSTICE SOUTER, with whom JUSTICE GINSBURG joins, concurring.

I join the Court's opinion subject to the same caveats about the Court's recent cases on the Eleventh Amendment and §5 of the Fourteenth that I noted in *Nevada Dept. of Human Resources* v. *Hibbs,* 538 U. S. 721, 740 (2003) (SOUTER, J., concurring).

Although I concur in the Court's approach applying the congruence-and-proportionality criteria to Title II of the Americans with Disabilities Act of 1990 as a guarantee of access to courts and related rights, I note that if the Court engaged in a more expansive enquiry as THE CHIEF JUSTICE suggests, *post,* at 551 (dissenting opinion), the evidence to be considered would underscore the appropriateness of action under §5 to address the situation of disabled individuals before the courts, for that evidence would show that the judiciary itself has endorsed the basis for some of the very discrimination subject to congressional remedy under §5. *Buck* v. *Bell,* 274 U. S. 200 (1927), was not grudging in sustaining the constitutionality of the once-pervasive practice of involuntarily sterilizing those with mental disabilities. See *id.,* at 207 ("It is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind. . . . Three generations of imbeciles are enough"). Laws compelling sterilization were often accompanied by others indiscriminately requiring institutionalization, and prohibiting certain individuals with disabilities from marrying, from voting, from attending public schools, and even from appearing in public.

One administrative action along these lines was judicially sustained in part as a justified precaution against the very sight of a child with cerebral palsy, lest he "produc[e] a depressing and nauseating effect" upon others. *State ex rel. Beattie v. Board of Ed. of Antigo*, 169 Wis. 231, 232, 172 N. W. 153 (1919) (approving his exclusion from public school).[1]

Many of these laws were enacted to implement the quondam science of eugenics, which peaked in the 1920's, yet the statutes and their judicial vindications sat on the books long after eugenics lapsed into discredit.[2] See U. S. Commission on Civil Rights, Accommodating the Spectrum of Individual Abilities 19–20 (1983). Quite apart from the fateful inspiration behind them, one pervasive fault of these provisions was their failure to reflect the "amount of flexibility and freedom" required to deal with "the wide variation in the abilities and needs" of people with disabilities. *Cleburne v. Cleburne Living Center, Inc.*, 473 U. S. 432, 445 (1985). Instead, like other invidious discrimination, they classified people without regard to individual capacities, and by that lack of regard did great harm. In sustaining the application of Title II today, the Court takes a welcome step away from the judiciary's prior endorsement of blunt instruments imposing legal handicaps.

JUSTICE GINSBURG, with whom JUSTICE SOUTER and JUSTICE BREYER join, concurring.

For the reasons stated by the Court, and mindful of Congress' objective in enacting the Americans with Disabilities

---

[1] See generally *Cleburne v. Cleburne Living Center, Inc.*, 473 U. S. 432, 463–464 (1985) (Marshall, J., concurring in judgment in part and dissenting in part); Burgdorf & Burgdorf, A History of Unequal Treatment: The Qualifications of Handicapped Persons As A "Suspect Class" Under the Equal Protection Clause, 15 Santa Clara Law. 855 (1975); Brief for United States 17–19.

[2] As the majority opinion shows, some of them persist to this day, *ante*, at 524–525, to say nothing of their lingering effects on society.

Act—the elimination or reduction of physical and social structures that impede people with some present, past, or perceived impairments from contributing, according to their talents, to our Nation's social, economic, and civic life—I join the Court's opinion.

The Americans with Disabilities Act of 1990 (ADA or Act), 42 U. S. C. §§ 12101–12213, is a measure expected to advance equal-citizenship stature for persons with disabilities. See Bagenstos, Subordination, Stigma, and "Disability," 86 Va. L. Rev. 397, 471 (2000) (ADA aims both to "guarante[e] a baseline of equal citizenship by protecting against stigma and systematic exclusion from public and private opportunities, and [to] protec[t] society against the loss of valuable talents"). As the Court's opinion relates, see *ante*, at 516–517, the Act comprises three parts, prohibiting discrimination in employment (Title I), public services, programs, and activities (Title II), and public accommodations (Title III). This case concerns Title II, which controls the conduct of administrators of public undertakings.

Including individuals with disabilities among people who count in composing "We the People," Congress understood in shaping the ADA, would sometimes require not blindfolded equality, but responsiveness to difference; not indifference, but accommodation. Central to the Act's primary objective, Congress extended the statute's range to reach all government activities, § 12132 (Title II), and required "reasonable modifications to [public actors'] rules, policies, or practices," §§ 12131(2)–12132 (Title II). See also § 12112(b)(5) (defining discrimination to include the failure to provide "reasonable accommodations") (Title I); § 12182(b)(2)(A)(ii) (requiring "reasonable modifications in [public accommodations'] policies, practices, or procedures") (Title III); Bagenstos, *supra*, at 435 (ADA supporters sought "to eliminate the practices that combine with physical and mental conditions to create what we call 'disability.' The society-wide universal access rules serve this function on the macro level, and the require-

ments of individualized accommodation and modification fill in the gaps on the micro level." (footnote omitted)).

In *Olmstead* v. *L. C.*, 527 U. S. 581 (1999), this Court responded with fidelity to the ADA's accommodation theme when it held a State accountable for failing to provide community residential placements for people with disabilities. The State argued in *Olmstead* that it had acted impartially, for it provided no community placements for individuals without disabilities. *Id.*, at 598. Congress, the Court observed, advanced in the ADA "a more comprehensive view of the concept of discrimination," *ibid.*, one that embraced failures to provide "reasonable accommodations," *id.*, at 601. The Court today is similarly faithful to the Act's demand for reasonable accommodation to secure access and avoid exclusion.

Legislation calling upon all government actors to respect the dignity of individuals with disabilities is entirely compatible with our Constitution's commitment to federalism, properly conceived. It seems to me not conducive to a harmonious federal system to require Congress, before it exercises authority under §5 of the Fourteenth Amendment, essentially to indict each State for disregarding the equal-citizenship stature of persons with disabilities. But see *post*, at 564 (SCALIA, J., dissenting) ("Congress may impose prophylactic §5 legislation only upon those particular States in which there has been an identified history of relevant constitutional violations."); *Nevada Dept. of Human Resources* v. *Hibbs*, 538 U. S. 721, 743 (2003) (SCALIA, J., dissenting) (to be controlled by §5 legislation, State "can demand that *it* be shown to have been acting in violation of the Fourteenth Amendment" (emphasis in original)). Members of Congress are understandably reluctant to condemn their own States as constitutional violators, complicit in maintaining the isolated and unequal status of persons with disabilities. I would not disarm a National Legislature for resisting an

adversarial approach to lawmaking better suited to the courtroom.

As the Court's opinion documents, see *ante*, at 524–529, Congress considered a body of evidence showing that in diverse parts of our Nation, and at various levels of government, persons with disabilities encounter access barriers to public facilities and services. That record, the Court rightly holds, at least as it bears on access to courts, sufficed to warrant the barrier-lowering, dignity-respecting national solution the People's representatives in Congress elected to order.

CHIEF JUSTICE REHNQUIST, with whom JUSTICE KENNEDY and JUSTICE THOMAS join, dissenting.

In *Board of Trustees of Univ. of Ala.* v. *Garrett*, 531 U. S. 356 (2001), we held that Congress did not validly abrogate States' Eleventh Amendment immunity when it enacted Title I of the Americans with Disabilities Act of 1990 (ADA or Act), 42 U. S. C. §§ 12111–12117. Today, the Court concludes that Title II of that Act, §§ 12131–12165, does validly abrogate that immunity, at least insofar "as it applies to the class of cases implicating the fundamental right of access to the courts." *Ante*, at 533–534. Because today's decision is irreconcilable with *Garrett* and the well-established principles it embodies, I dissent.

The Eleventh Amendment bars private lawsuits in federal court against an unconsenting State. *E. g., Nevada Dept. of Human Resources* v. *Hibbs*, 538 U. S. 721, 726 (2003); *Garrett, supra*, at 363; *Kimel* v. *Florida Bd. of Regents*, 528 U. S. 62, 73 (2000). Congress may overcome States' sovereign immunity and authorize such suits only if it unmistakably expresses its intent to do so, and only if it "acts pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment." *Hibbs, supra*, at 726. While the Court correctly holds that Congress satisfied the first prerequisite, *ante*, at 518, I disagree with its conclusion that Title II is valid § 5 enforcement legislation.

Section 5 of the Fourteenth Amendment grants Congress the authority "to enforce, by appropriate legislation," the familiar substantive guarantees contained in §1 of that Amendment. U. S. Const., Amdt. 14, §1 ("No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws"). Congress' power to enact "'appropriate'" enforcement legislation is not limited to "mere legislative repetition" of this Court's Fourteenth Amendment jurisprudence. *Garrett, supra,* at 365. Congress may "remedy" and "deter" state violations of constitutional rights by "prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." *Hibbs,* 538 U. S., at 727 (internal quotation marks omitted). Such "prophylactic" legislation, however, "must be an appropriate remedy for identified constitutional violations, not 'an attempt to substantively redefine the States' legal obligations.'" *Id.,* at 727–728 (quoting *Kimel, supra,* at 88); *City of Boerne* v. *Flores,* 521 U. S. 507, 525 (1997) (enforcement power is "corrective or preventive, not definitional"). To ensure that Congress does not usurp this Court's responsibility to define the meaning of the Fourteenth Amendment, valid §5 legislation must exhibit "'congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'" *Hibbs, supra,* at 728 (quoting *City of Boerne, supra,* at 520). While the Court today pays lipservice to the "'congruence and proportionality'" test, see *ante,* at 520, it applies it in a manner inconsistent with our recent precedents.

In *Garrett,* we conducted the three-step inquiry first enunciated in *City of Boerne* to determine whether Title I of the ADA satisfied the congruence-and-proportionality test. A faithful application of that test to Title II reveals that it too "'substantively redefine[s],'" rather than permissibly enforces, the rights protected by the Fourteenth Amendment. *Hibbs, supra,* at 728.

The first step is to "identify with some precision the scope of the constitutional right at issue." *Garrett, supra,* at 365. This task was easy in *Garrett, Hibbs, Kimel,* and *City of Boerne* because the statutes in those cases sought to enforce only one constitutional right. In *Garrett,* for example, the statute addressed the equal protection right of disabled persons to be free from unconstitutional employment discrimination. 531 U. S., at 365. See also *Hibbs, supra,* at 728 ("The [Family and Medical Leave Act of 1993 (FMLA)] aims to protect the right to be free from gender-based discrimination in the workplace"); *Kimel, supra,* at 83 (right to be free from unconstitutional age discrimination in employment); *City of Boerne, supra,* at 529 (right of free exercise of religion). The scope of that right, we explained, is quite limited; indeed, the Equal Protection Clause permits a State to classify on the basis of disability so long as it has a rational basis for doing so. *Garrett, supra,* at 366–368 (discussing *Cleburne* v. *Cleburne Living Center, Inc.,* 473 U. S. 432 (1985)); see also *ante,* at 522.

In this case, the task of identifying the scope of the relevant constitutional protection is more difficult because Title II purports to enforce a panoply of constitutional rights of disabled persons: not only the equal protection right against irrational discrimination, but also certain rights protected by the Due Process Clause. *Ante,* at 522–523. However, because the Court ultimately upholds Title II "as it applies to the class of cases implicating the fundamental right of access to the courts," *ante,* at 533–534, the proper inquiry focuses on the scope of those due process rights. The Court cites four access-to-the-courts rights that Title II purportedly enforces: (1) the right of the criminal defendant to be present at all critical stages of the trial, *Faretta* v. *California,* 422 U. S. 806, 819 (1975); (2) the right of litigants to have a "meaningful opportunity to be heard" in judicial proceedings, *Boddie* v. *Connecticut,* 401 U. S. 371, 379 (1971); (3) the right of the criminal defendant to trial by a jury composed

of a fair cross section of the community, *Taylor* v. *Louisiana*, 419 U. S. 522, 530 (1975); and (4) the public right of access to criminal proceedings, *Press-Enterprise Co.* v. *Superior Court of Cal., County of Riverside*, 478 U. S. 1, 8–15 (1986). *Ante*, at 522–523.

Having traced the "metes and bounds" of the constitutional rights at issue, the next step in the congruence-and-proportionality inquiry requires us to examine whether Congress "identified a history and pattern" of violations of these constitutional rights by the States with respect to the disabled. *Garrett*, 531 U. S., at 368. This step is crucial to determining whether Title II is a legitimate attempt to remedy or prevent actual constitutional violations by the States or an illegitimate attempt to rewrite the constitutional provisions it purports to enforce. Indeed, "Congress' § 5 authority is appropriately exercised *only* in response to state transgressions." *Ibid.* (emphasis added). But the majority identifies nothing in the legislative record that shows Congress was responding to widespread violations of the due process rights of disabled persons.

Rather than limiting its discussion of constitutional violations to the due process rights on which it ultimately relies, the majority sets out on a wide-ranging account of societal discrimination against the disabled. *Ante*, at 524–526. This digression recounts historical discrimination against the disabled through institutionalization laws, restrictions on marriage, voting, and public education, conditions in mental hospitals, and various other forms of unequal treatment in the administration of public programs and services. Some of this evidence would be relevant if the Court were considering the constitutionality of the statute as a whole; but the Court rejects that approach in favor of a narrower "as-applied" inquiry.[1] We discounted much the same type of outdated, generalized evidence in *Garrett* as unsupportive of

---

[1] For further discussion of the propriety of this approach, see *infra*, at 551–552.

Title I's ban on employment discrimination. 531 U. S., at 368–372; see also *City of Boerne,* 521 U. S., at 530 (noting that the "legislative record lacks . . . modern instances of . . . religious bigotry"). The evidence here is likewise irrelevant to Title II's purported enforcement of due process access-to-the-courts rights.

Even if it were proper to consider this broader category of evidence, much of it does not concern *unconstitutional* action by the *States.* The bulk of the Court's evidence concerns discrimination by nonstate governments, rather than the States themselves.[2] We have repeatedly held that such evidence is irrelevant to the inquiry whether Congress has validly abrogated Eleventh Amendment immunity, a privilege enjoyed only by the sovereign States. *Garrett, supra,* at 368–369; *Florida Prepaid Postsecondary Ed. Expense Bd.* v. *College Savings Bank,* 527 U. S. 627, 640 (1999); *Kimel,* 528 U. S., at 89. Moreover, the majority today cites the same congressional task force evidence we rejected in *Garrett. Ante,* at 526 (citing *Garrett, supra,* at 379 (BREYER, J., dissenting), and 531 U. S., at 391–424 (App. C to opinion of BREYER, J., dissenting) (chronicling instances of "unequal treatment" in the "administration of public programs")). As in *Garrett,* this "unexamined, anecdotal" evidence does not suffice. 531 U. S., at 370. Most of the brief anecdotes do not involve States at all, and those that do are not sufficiently detailed to determine whether the instances of "unequal treatment" were irrational, and thus unconstitutional under our decision in *Cleburne. Garrett, supra,* at 370–371.

---

[2] *E. g., ante,* at 525 (citing *Cleburne* v. *Cleburne Living Center, Inc.,* 473 U. S. 432 (1985) (irrational discrimination by city zoning board)); *ante,* at 525, n. 13 (citing *New York ex rel. Spitzer* v. *County of Delaware,* 82 F. Supp. 2d 12 (NDNY 2000) (ADA lawsuit *brought by State* against a county)); *ante,* at 525, n. 12 (citing four cases concerning local school boards' unconstitutional actions); *ante,* at 525, n. 11 (citing one case involving conditions in federal prison and another involving a county jail inmate); *ante,* at 526 (referring to "hundreds of examples of unequal treatment . . . by States *and their political subdivisions*" (emphasis added)).

Therefore, even outside the "access to the courts" context, the Court identifies few, if any, constitutional violations perpetrated by the States against disabled persons.[3]

With respect to the due process "access to the courts" rights on which the Court ultimately relies, Congress' failure to identify a pattern of actual constitutional violations by the States is even more striking. Indeed, there is *nothing* in the legislative record or statutory findings to indicate that disabled persons were systematically denied the right to be present at criminal trials, denied the meaningful opportunity to be heard in civil cases, unconstitutionally excluded from jury service, or denied the right to attend criminal trials.[4]

The Court's attempt to disguise the lack of congressional documentation with a few citations to judicial decisions cannot retroactively provide support for Title II, and in any event, fails on its own terms. See, *e. g., Garrett*, 531 U. S., at 368 ("[W]e examine whether *Congress* identified a history and pattern" of constitutional violations); *ibid.* ("The *legislative record* . . . fails to show that *Congress* did in fact identify

---

[3] The majority obscures this fact by repeatedly referring to congressional findings of "discrimination" and "unequal treatment." Of course, generic findings of discrimination and unequal treatment *vel non* are insufficient to show a pattern of *constitutional* violations where rational-basis scrutiny applies. *Board of Trustees of Univ. of Ala.* v. *Garrett*, 531 U. S. 356, 370 (2001).

[4] Certainly, respondents Lane and Jones were not denied these constitutional rights. The majority admits that Lane was able to attend the initial hearing of his criminal trial. *Ante*, at 514. Lane was arrested for failing to appear at his second hearing only after he refused assistance from officers dispatched by the court to help him to the courtroom. *Ibid.* The court conducted a preliminary hearing in the first-floor library to accommodate Lane's disability, App. to Pet. for Cert. 16, and later offered to move all further proceedings in the case to a handicapped-accessible courthouse in a nearby town. In light of these facts, it can hardly be said that the State violated Lane's right to be present at his trial; indeed, it made affirmative attempts to secure that right. Respondent Jones, a disabled court reporter, does not seriously contend that she suffered a constitutional injury.

a pattern" of constitutional violations (emphases added)). Indeed, because this type of constitutional violation occurs in connection with litigation, it is particularly telling that the majority is able to identify only *two* reported cases finding that a disabled person's federal constitutional rights were violated.[5]  See *ante*, at 525–526, n. 14 (citing *Ferrell* v. *Estelle*, 568 F. 2d 1128, 1132–1133 (CA5), opinion withdrawn as moot, 573 F. 2d 867 (1978); *People* v. *Rivera*, 125 Misc. 2d 516, 528, 480 N. Y. S. 2d 426, 434 (Sup. Ct. 1984)).[6]

Lacking any real evidence that Congress was responding to actual due process violations, the majority relies primarily on three items to justify its decision: (1) a 1983 U. S. Civil Rights Commission Report showing that 76% of "public services and programs housed in state-owned buildings were inaccessible" to persons with disabilities, *ante*, at 527; (2) testimony before a House subcommittee regarding the "physical inaccessibility" of local courthouses, *ibid.*; and (3) evidence submitted to Congress' designated ADA task

---

[5] As two Justices noted in *Garrett*, if the States were violating the due process rights of disabled persons, "one would have expected to find in decisions of the courts . . . extensive litigation and discussion of the constitutional violations."  531 U. S., at 376 (KENNEDY, J., joined by O'CONNOR, J., concurring).

[6] The balance of the Court's citations refer to cases arising *after* enactment of the ADA or do not contain findings of federal constitutional violations.  *Ante*, at 525–526, n. 14 (citing *Layton* v. *Elder*, 143 F. 3d 469 (CA8 1998) (post-ADA case finding ADA violations only); *Matthews* v. *Jefferson*, 29 F. Supp. 2d 525 (WD Ark. 1998) (same); *Galloway* v. *Superior Court*, 816 F. Supp. 12 (DC 1993) (same); *State* v. *Schaim*, 65 Ohio St. 3d 51, 600 N. E. 2d 661 (1992) (remanded for hearing on constitutional issue); *People* v. *Green*, 148 Misc. 2d 666, 561 N. Y. S. 2d 130 (Cty. Ct. 1990) (finding violation of state constitution only); *DeLong* v. *Brumbaugh*, 703 F. Supp. 399 (WD Pa. 1989) (statute upheld against facial constitutional challenge; Rehabilitation Act of 1973 violations only); *Pomerantz* v. *Los Angeles County*, 674 F. 2d 1288 (CA9 1982) (Rehabilitation Act of 1973 claim; challenged jury-service statute later amended)).  Accordingly, they offer no support whatsoever for the notion that Title II is a valid response to documented constitutional violations.

force that purportedly contains "numerous examples of the exclusion of persons with disabilities from state judicial services and programs." *Ibid.*

On closer examination, however, the Civil Rights Commission's finding consists of a single conclusory sentence in its report, and it is far from clear that its finding even includes courthouses. The House subcommittee report, for its part, contains the testimony of *two* witnesses, neither of whom reported being denied the right to be present at constitutionally protected court proceedings.[7] Indeed, the witnesses' testimony, like the U. S. Commission on Civil Rights Report, concerns only physical barriers to access, and does not address whether States either provided means to overcome those barriers or alternative locations for proceedings involving disabled persons. Cf. n. 4, *supra* (describing alternative means of access offered to respondent Lane).

Based on the majority's description, *ante,* at 527, the report of the ADA Task Force on the Rights and Empowerment of Americans with Disabilities sounds promising. But the report itself says nothing about any disabled person being denied access to court. The Court thus apparently relies solely on a general citation to the Government's Lodging in *Garrett,* O. T. 2000, No. 99–1240, which, amidst thousands of pages, contains only a few anecdotal handwritten reports of physically inaccessible courthouses, again with no mention of whether States provided alternative means of access. This evidence, moreover, was submitted not to Congress, but only to the task force, which itself made no

---

[7] Oversight Hearing on H. R. 4498 before the House Subcommittee on Select Education of the Committee on Education and Labor, 100th Cong., 2d Sess., 40–41 (1988) (statement of Emeka Nwojke) (explaining that he encountered difficulties appearing in court due to physical characteristics of the courthouse and courtroom and the rudeness of court employees); *id.,* at 48 (statement of Ellen Telker) (blind attorney "know[s] of at least one courthouse in New Haven where the elevators do not have tactile markings").

findings regarding disabled persons' access to judicial proceedings. Cf. *Garrett*, 531 U. S., at 370–371 (rejecting anecdotal task force evidence for similar reasons). As we noted in *Garrett*, "had Congress truly understood this [task force] information as reflecting a pattern of unconstitutional behavior by the States, one would expect some mention of that conclusion in the Act's legislative findings." *Id.*, at 371. Yet neither the legislative findings, nor even the Committee Reports, contain a single mention of the seemingly vital topic of access to the courts.[8] Cf. *ibid.; Florida Prepaid*, 527 U. S., at 641 (observing that Senate Report on Patent and Plant Variety Protection Remedy Clarification Act (Patent Remedy Act) "contains no evidence that unremedied patent infringement by States had become a problem of national import"). To the contrary, the Senate Report on the ADA observed that "[a]ll states currently mandate accessibility in newly constructed state-owned public buildings." S. Rep. No. 101–116, p. 92 (1989).

Even if the anecdotal evidence and conclusory statements relied on by the majority could be properly considered, the mere existence of an architecturally "inaccessible" courthouse—*i. e.*, one a disabled person cannot utilize without assistance—does not state a constitutional violation. A violation of due process occurs only when a person is actually denied the constitutional right to access a given judicial proceeding. We have never held that a person has a *constitutional* right to make his way into a courtroom without any

---

[8] The majority rather peculiarly points to Congress' finding that "'discrimination against individuals with disabilities persists in such critical areas as . . . *access to public services*'" as evidence that Congress sought to vindicate the due process rights of disabled persons. *Ante*, at 529 (quoting 42 U. S. C. § 12101(a)(3) (emphasis added by the Court)). However, one does not usually refer to the right to attend a judicial proceeding as "access to [a] public servic[e]." Given the lack of any concern over courthouse accessibility issues in the legislative history, it is highly unlikely that this legislative finding obliquely refers to state violations of the due process rights of disabled persons to attend judicial proceedings.

external assistance. Indeed, the fact that the State may need to assist an individual to attend a hearing has no bearing on whether the individual successfully exercises his due process right to be present at the proceeding. Nor does an "inaccessible" courthouse violate the Equal Protection Clause, unless it is irrational for the State not to alter the courthouse to make it "accessible." But financial considerations almost always furnish a rational basis for a State to decline to make those alterations. See *Garrett*, 531 U. S., at 372 (noting that it would be constitutional for an employer to "conserve scarce financial resources" by hiring employees who can use existing facilities rather than making the facilities accessible to disabled employees). Thus, evidence regarding inaccessible courthouses, because it is not evidence of constitutional violations, provides no basis to abrogate States' sovereign immunity.

The near-total lack of actual constitutional violations in the congressional record is reminiscent of *Garrett*, wherein we found that the same type of minimal anecdotal evidence "f[e]ll far short of even suggesting the pattern of unconstitutional [state action] on which § 5 legislation must be based." *Id.*, at 370. See also *Kimel*, 528 U. S., at 91 ("Congress' failure to uncover any significant pattern of unconstitutional discrimination here confirms that Congress had no reason to believe that broad prophylactic legislation was necessary"); *Florida Prepaid, supra,* at 645 ("The legislative record thus suggests that the Patent Remedy Act did not respond to a history of 'widespread and persisting deprivation of constitutional rights' of the sort Congress has faced in enacting proper prophylactic § 5 legislation" (quoting *City of Boerne,* 521 U. S., at 526)).

The barren record here should likewise be fatal to the majority's holding that Title II is valid legislation enforcing due process rights that involve access to the courts. This conclusion gains even more support when Title II's nonexistent record of constitutional violations is compared with legisla-

tion that we have sustained as valid § 5 enforcement legislation. See, e. g., *Hibbs*, 538 U. S., at 729–732 (tracing the extensive legislative record documenting States' gender discrimination in employment leave policies); *South Carolina* v. *Katzenbach*, 383 U. S. 301, 312–313 (1966) (same with respect to racial discrimination in voting rights). Accordingly, Title II can only be understood as a congressional attempt to "rewrite the Fourteenth Amendment law laid down by this Court," rather than a legitimate effort to remedy or prevent state violations of that Amendment. *Garrett, supra,* at 374.[9]

The third step of our congruence-and-proportionality inquiry removes any doubt as to whether Title II is valid § 5 legislation. At this stage, we ask whether the rights and remedies created by Title II are congruent and proportional to the constitutional rights it purports to enforce and the record of constitutional violations adduced by Congress. *Hibbs, supra,* at 737–739; *Garrett, supra,* at 372–373.

Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to dis-

---

[9] The Court correctly explains that "'it [i]s easier for Congress to show a pattern of state constitutional violations'" when it targets state action that triggers a higher level of constitutional scrutiny. *Ante,* at 529 (quoting *Nevada Dept. of Human Resources* v. *Hibbs,* 538 U. S. 721, 736 (2003)). However, this Court's precedents attest that Congress may not dispense with the required showing altogether simply because it purports to enforce due process rights. See *Florida Prepaid Postsecondary Ed. Expense Bd.* v. *College Savings Bank,* 527 U. S. 627, 645–646 (1999) (invalidating Patent Remedy Act, which purported to enforce the Due Process Clause, because Congress failed to identify a record of constitutional violations); *City of Boerne* v. *Flores,* 521 U. S. 507, 530–531 (1997) (same with respect to Religious Freedom Restoration Act of 1993 (RFRA)). As the foregoing discussion demonstrates, that is precisely what the Court has sanctioned here. Because the record is utterly devoid of proof that Congress was responding to state violations of due process access-to-the-courts rights, this case is controlled by *Florida Prepaid* and *City of Boerne,* rather than *Hibbs.*

crimination by any such entity." 42 U. S. C. § 12132. A disabled person is considered "qualified" if he "meets the essential eligibility requirements" for the receipt of the entity's services or participation in the entity's programs, *with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services.*" § 12131(2) (emphasis added). The ADA's findings make clear that Congress believed it was attacking "discrimination" in all areas of public services, as well as the "discriminatory effects" of "architectural, transportation, and communication barriers." §§ 12101(a)(3), (a)(5). In sum, Title II requires, on pain of money damages, special accommodations for disabled persons in virtually every interaction they have with the State.

"Despite subjecting States to this expansive liability," the broad terms of Title II "d[o] nothing to limit the coverage of the Act to cases involving arguable constitutional violations." *Florida Prepaid,* 527 U. S., at 646. By requiring special accommodation and the elimination of programs that have a disparate impact on the disabled, Title II prohibits far more state conduct than does the equal protection ban on irrational discrimination. We invalidated Title I's similar requirements in *Garrett,* observing that "[i]f special accommodations for the disabled are to be required, they have to come from positive law and not through the Equal Protection Clause." 531 U. S., at 368; *id.,* at 372–373 (contrasting Title I's reasonable accommodation and disparate-impact provisions with the Fourteenth Amendment's requirements). Title II fails for the same reason. Like Title I, Title II may be laudable public policy, but it cannot be seriously disputed that it is also an attempt to legislatively "redefine the States' legal obligations" under the Fourteenth Amendment. *Kimel, supra,* at 88.

The majority, however, claims that Title II also vindicates fundamental rights protected by the Due Process Clause—

in addition to access to the courts—that are subject to heightened Fourteenth Amendment scrutiny. *Ante*, at 522–523 (citing *Dunn* v. *Blumstein*, 405 U. S. 330, 336–337 (1972) (voting); *Shapiro* v. *Thompson*, 394 U. S. 618, 634 (1969) (right to move to a new jurisdiction); *Skinner* v. *Oklahoma ex rel. Williamson*, 316 U. S. 535, 541 (1942) (marriage and procreation)). But Title II is not tailored to provide prophylactic protection of these rights; instead, it applies to any service, program, or activity provided by any entity. Its provisions affect transportation, health, education, and recreation programs, among many others, all of which are accorded only rational-basis scrutiny under the Equal Protection Clause. A requirement of accommodation for the disabled at a state-owned amusement park or sports stadium, for example, bears no permissible prophylactic relationship to enabling disabled persons to exercise their fundamental constitutional rights. Thus, as with Title I in *Garrett*, the Patent Remedy Act in *Florida Prepaid*, the Age Discrimination in Employment Act of 1967 in *Kimel*, and the RFRA in *City of Boerne*, all of which we invalidated as attempts to substantively redefine the Fourteenth Amendment, it is unlikely "that many of the [state actions] affected by [Title II] have [any] likelihood of being unconstitutional." *City of Boerne, supra,* at 532. Viewed as a whole, then, there is little doubt that Title II of the ADA does not validly abrogate state sovereign immunity.[10]

---

[10] Title II's all-encompassing approach to regulating public services contrasts starkly with the more closely tailored laws we have upheld as legitimate prophylactic §5 legislation. In *Hibbs*, for example, the FMLA was "narrowly targeted" to remedy widespread gender discrimination in the availability of family leave. 538 U. S., at 738–739 (distinguishing *City of Boerne, Kimel* v. *Florida Bd. of Regents,* 528 U. S. 62 (2000), and *Garrett* on this ground). Similarly, in cases involving enforcement of the Fifteenth Amendment, we upheld "limited remedial scheme[s]" that were narrowly tailored to address massive evidence of discrimination in voting. *Garrett,* 531 U. S., at 373 (discussing *South Carolina* v. *Katzenbach,* 383 U. S. 301 (1966)). Unlike these statutes, Title II's "indiscriminate scope

The majority concludes that Title II's massive overbreadth can be cured by considering the statute only "as it applies to the class of cases implicating the accessibility of judicial services." *Ante*, at 531 (citing *United States* v. *Raines*, 362 U. S. 17, 26 (1960)). I have grave doubts about importing an "as applied" approach into the § 5 context. While the majority is of course correct that this Court normally only considers the application of a statute to a particular case, the proper inquiry under *City of Boerne* and its progeny is somewhat different. In applying the congruence-and-proportionality test, we ask whether Congress has attempted to statutorily redefine the constitutional rights protected by the Fourteenth Amendment. This question can only be answered by measuring the breadth of a statute's coverage against the scope of the constitutional rights it purports to enforce and the record of violations it purports to remedy.

In conducting its as-applied analysis, however, the majority posits a hypothetical statute, never enacted by Congress, that applies only to courthouses. The effect is to rig the congruence-and-proportionality test by artificially constricting the scope of the statute to closely mirror a recognized constitutional right. But Title II is not susceptible of being carved up in this manner; it applies indiscriminately to all "services," "programs," or "activities" of any "public entity." Thus, the majority's approach is not really an assessment of whether Title II is "appropriate *legislation*" at all, U. S. Const., Amdt. 14, § 5 (emphasis added), but a test of whether the Court can conceive of a hypothetical statute narrowly tailored enough to constitute valid prophylactic legislation.

Our § 5 precedents do not support this as-applied approach. In each case, we measured the full breadth of the statute or relevant provision that Congress enacted against

---

... is particularly incongruous in light of the scant support for the predicate unconstitutional conduct that Congress intended to remedy." *Florida Prepaid,* 527 U. S., at 647.

the scope of the constitutional right it purported to enforce. If we had arbitrarily constricted the scope of the statutes to match the scope of a core constitutional right, those cases might have come out differently. In *Garrett*, for example, Title I might have been upheld "as applied" to irrational employment discrimination; or in *Florida Prepaid*, the Patent Remedy Act might have been upheld "as applied" to intentional, uncompensated patent infringements. It is thus not surprising that the only authority cited by the majority is *Raines, supra*, a case decided long before we enunciated the congruence-and-proportionality test.[11]

I fear that the Court's adoption of an as-applied approach eliminates any incentive for Congress to craft § 5 legislation for the purpose of remedying or deterring actual constitutional violations. Congress can now simply rely on the courts to sort out which hypothetical applications of an undifferentiated statute, such as Title II, may be enforced against the States. All the while, States will be subjected to substantial litigation in a piecemeal attempt to vindicate their Eleventh Amendment rights. The majority's as-applied approach simply cannot be squared with either our recent precedent or the proper role of the Judiciary.

---

[11] *Raines* is inapposite in any event. The Court there considered the constitutionality of the Civil Rights Act of 1957—a statute designed to enforce the Fifteenth Amendment—whose narrowly tailored substantive provisions could "unquestionably" be applied to state actors (like the respondents therein). 362 U. S., at 25, 26. The only question presented was whether the statute was facially invalid because it might be read to constrain nonstate actors as well. *Id.*, at 20. The Court upheld the statute as applied to respondents and declined to entertain the facial challenge. *Id.*, at 24–26. The situation in this case is much different: The very question presented is whether Title II's indiscriminate substantive provisions can constitutionally be applied to the petitioner State. *Raines* thus provides no support for avoiding this question by conjuring up an imaginary statute with substantive provisions that might pass the congruence-and-proportionality test.

Even in the limited courthouse-access context, Title II does not properly abrogate state sovereign immunity. As demonstrated in depth above, Congress utterly failed to identify any evidence that disabled persons were denied constitutionally protected access to judicial proceedings. Without this predicate showing, Title II, even if we were to hypothesize that it applies only to courthouses, cannot be viewed as a congruent and proportional response to state constitutional violations. *Garrett*, 531 U. S., at 368 ("Congress' § 5 authority is appropriately exercised only in response to state transgressions").

Moreover, even in the courthouse-access context, Title II requires substantially more than the Due Process Clause. Title II subjects States to private lawsuits if, *inter alia,* they fail to make "reasonable modifications" to facilities, such as removing "architectural . . . barriers." 42 U. S. C. §§ 12131(2), 12132. Yet the statute is not limited to occasions when the failure to modify results, or will likely result, in an actual due process violation—*i. e.,* the inability of a disabled person to participate in a judicial proceeding. Indeed, liability is triggered if an inaccessible building results in a disabled person being "subjected to discrimination"—a term that presumably encompasses any sort of inconvenience in accessing the facility, for whatever purpose. § 12132.

The majority's reliance on *Boddie* v. *Connecticut,* 401 U. S. 371 (1971), and other cases in which we held that due process requires the State to waive filing fees for indigent litigants, is unavailing. While these cases support the principle that the State must remove financial requirements that in fact prevent an individual from exercising his constitutional rights, they certainly do not support a statute that subjects a State to liability for failing to make a vast array of special accommodations, *without regard for whether the failure to accommodate results in a constitutional wrong.*

In this respect, Title II is analogous to the Patent Remedy Act at issue in *Florida Prepaid*. That statute subjected States to monetary liability for any act of patent infringement. 527 U. S., at 646–647. Thus, "Congress did nothing to limit" the Patent Remedy Act's coverage "to cases involving arguable [due process] violations," such as when the infringement was nonnegligent or uncompensated. *Ibid.* Similarly here, Congress has authorized private damages suits against a State for merely maintaining a courthouse that is not readily accessible to the disabled, without regard to whether a disabled person's due process rights are ever violated. Accordingly, even as applied to the "access to the courts" context, Title II's "indiscriminate scope offends [the congruence-and-proportionality] principle," particularly in light of the lack of record evidence showing that inaccessible courthouses cause actual due process violations. *Id.*, at 647.[12]

For the foregoing reasons, I respectfully dissent.

JUSTICE SCALIA, dissenting.

Section 5 of the Fourteenth Amendment provides that Congress "shall have power to enforce, by appropriate legislation, the provisions" of that Amendment—including, of course, the Amendment's Equal Protection and Due Process Clauses. In *Katzenbach* v. *Morgan*, 384 U. S. 641 (1966), we

---

[12] The majority's invocation of *Hibbs* to justify Title II's overbreadth is unpersuasive. See *ante*, at 533, n. 24. The *Hibbs* Court concluded that "in light of the evidence before Congress" the FMLA's 12-week family-leave provision was necessary to "achiev[e] Congress' remedial object." 538 U. S., at 748. The Court found that the legislative record included not only evidence of state constitutional violations, but evidence that a provision merely enforcing the Equal Protection Clause would actually perpetuate the gender stereotypes Congress sought to eradicate because employers could simply eliminate family leave entirely. *Ibid.* Without comparable evidence of constitutional violations and the necessity of prophylactic measures, the Court has no basis on which to uphold Title II's special-accommodation requirements.

decided that Congress could, under this provision, forbid English literacy tests for Puerto Rican voters in New York State who met certain educational criteria. Though those tests were not themselves in violation of the Fourteenth Amendment, we held that §5 authorizes prophylactic legislation—that is, "legislation that proscribes facially constitutional conduct," *Nevada Dept. of Human Resources* v. *Hibbs*, 538 U. S. 721, 728 (2003), when Congress determines such proscription is desirable "'to make the amendments fully effective,'" *Morgan, supra,* at 648 (quoting *Ex parte Virginia,* 100 U. S. 339, 345 (1880)). We said that "the measure of what constitutes 'appropriate legislation' under §5 of the Fourteenth Amendment" is the flexible "necessary and proper" standard of *McCulloch* v. *Maryland,* 4 Wheat. 316, 342, 421 (1819). *Morgan,* 384 U. S., at 651. We described §5 as "a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment." *Ibid.*

The *Morgan* opinion followed close upon our decision in *South Carolina* v. *Katzenbach,* 383 U. S. 301 (1966), which had upheld prophylactic application of the similarly worded "enforce" provision of the Fifteenth Amendment (§2) to challenged provisions of the Voting Rights Act of 1965. But the Fourteenth Amendment, unlike the Fifteenth, is not limited to denial of the franchise and not limited to the denial of other rights on the basis of race. In *City of Boerne* v. *Flores,* 521 U. S. 507 (1997), we confronted Congress's inevitable expansion of the Fourteenth Amendment, as interpreted in *Morgan,* beyond the field of racial discrimination.[1] There Congress had sought, in the Religious Freedom Restoration

---

[1] Congress had previously attempted such an extension in the Voting Rights Act Amendments of 1970, 84 Stat. 318, which sought to lower the voting age in state elections from 21 to 18. This extension was rejected, but in three separate opinions, none of which commanded a majority of the Court. See *infra,* at 563.

Act of 1993, 107 Stat. 1488, 42 U. S. C. § 2000bb *et seq.*, to impose upon the States an interpretation of the First Amendment's Free Exercise Clause that this Court had explicitly rejected. To avoid placing in congressional hands effective power to rewrite the Bill of Rights through the medium of § 5, we formulated the "congruence and proportionality" test for determining what legislation is "appropriate." When Congress enacts prophylactic legislation, we said, there must be "proportionality or congruence between the means adopted and the legitimate end to be achieved." 521 U. S., at 533.

I joined the Court's opinion in *Boerne* with some misgiving. I have generally rejected tests based on such malleable standards as "proportionality," because they have a way of turning into vehicles for the implementation of individual judges' policy preferences. See, *e. g.*, *Ewing* v. *California*, 538 U. S. 11, 31–32 (2003) (SCALIA, J., concurring in judgment) (declining to apply a "proportionality" test to the Eighth Amendment's ban on cruel and unusual punishment); *Stenberg* v. *Carhart*, 530 U. S. 914, 954–956 (2000) (SCALIA, J., dissenting) (declining to apply the "undue burden" standard of *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833 (1992)); *BMW of North America, Inc.* v. *Gore*, 517 U. S. 559, 599 (1996) (SCALIA, J., dissenting) (declining to apply a "reasonableness" test to punitive damages under the Due Process Clause). Even so, I signed on to the "congruence and proportionality" test in *Boerne*, and adhered to it in later cases: *Florida Prepaid Postsecondary Ed. Expense Bd.* v. *College Savings Bank*, 527 U. S. 627 (1999), where we held that the provisions of the Patent and Plant Variety Protection Remedy Clarification Act, 35 U. S. C. §§ 271(h), 296(a), were " 'so out of proportion to a supposed remedial or preventive object that [they] cannot be understood as responsive to, or designed to prevent, unconstitutional behavior,' " 527 U. S., at 646 (quoting *Boerne, supra,* at 532); *Kimel* v. *Florida Bd. of Regents*, 528 U. S. 62 (2000), where we held that

the Age Discrimination in Employment Act of 1967, 81 Stat. 602, as amended, 29 U. S. C. § 621 *et seq.* (1994 ed. and Supp. III), imposed on state and local governments requirements "disproportionate to any unconstitutional conduct that conceivably could be targeted by the Act," 528 U. S., at 83; *United States* v. *Morrison,* 529 U. S. 598 (2000), where we held that a provision of the Violence Against Women Act of 1994, 42 U. S. C. § 13981, lacked congruence and proportionality because it was "not aimed at proscribing discrimination by officials which the Fourteenth Amendment might not itself proscribe," 529 U. S., at 626; and *Board of Trustees of Univ. of Ala.* v. *Garrett,* 531 U. S. 356 (2001), where we said that Title I of the Americans with Disabilities Act of 1990 (ADA), 104 Stat. 330, 42 U. S. C. §§ 12111–12117, raised "the same sort of concerns as to congruence and proportionality as were found in *City of Boerne,*" 531 U. S., at 372.

But these cases were soon followed by *Nevada Dept. of Human Resources* v. *Hibbs,* in which the Court held that the Family and Medical Leave Act of 1993, 107 Stat. 9, 29 U. S. C. § 2612 *et seq.,* which required States to provide their employees up to 12 work weeks of unpaid leave (for various purposes) annually, was "congruent and proportional to its remedial object [of preventing sex discrimination], and can be understood as responsive to, or designed to prevent, unconstitutional behavior." 538 U. S., at 740 (internal quotation marks omitted). I joined JUSTICE KENNEDY's dissent, which established (conclusively, I thought) that Congress had identified no unconstitutional state action to which the statute could conceivably be a proportional response. And now we have today's decision, holding that Title II of the ADA is congruent and proportional to the remediation of constitutional violations, in the face of what seems to me a compelling demonstration of the opposite by THE CHIEF JUSTICE's dissent.

I yield to the lessons of experience. The "congruence and proportionality" standard, like all such flabby tests, is a

standing invitation to judicial arbitrariness and policy-driven decisionmaking. Worse still, it casts this Court in the role of Congress's taskmaster. Under it, the courts (and ultimately this Court) must regularly check Congress's homework to make sure that it has identified sufficient constitutional violations to make its remedy congruent and proportional. As a general matter, we are ill advised to adopt or adhere to constitutional rules that bring us into constant conflict with a coequal branch of Government. And when conflict is unavoidable, we should not come to do battle with the United States Congress armed only with a test ("congruence and proportionality") that has no demonstrable basis in the text of the Constitution and cannot objectively be shown to have been met or failed. As I wrote for the Court in an earlier case, "low walls and vague distinctions will not be judicially defensible in the heat of interbranch conflict." *Plaut* v. *Spendthrift Farm, Inc.*, 514 U. S. 211, 239 (1995).

I would replace "congruence and proportionality" with another test—one that provides a clear, enforceable limitation supported by the text of § 5. Section 5 grants Congress the power "to *enforce*, by appropriate legislation," the other provisions of the Fourteenth Amendment. U. S. Const., Amdt. 14 (emphasis added). *Morgan* notwithstanding, one does not, within any normal meaning of the term, "enforce" a prohibition by issuing a still broader prohibition directed to the same end. One does not, for example, "enforce" a 55-mile-per-hour speed limit by imposing a 45-mile-per-hour speed limit—even though that is indeed directed to the same end of automotive safety and will undoubtedly result in many fewer violations of the 55-mile-per-hour limit. And one does not "enforce" the right of access to the courts at issue in this case, see *ante*, at 531, by requiring that disabled persons be provided access to *all* of the "services, programs, or activities" furnished or conducted by the State, 42 U. S. C. § 12132. That is simply not what the power to enforce means—or ever

meant. The 1860 edition of Noah Webster's American Dictionary of the English Language, current when the Fourteenth Amendment was adopted, defined "enforce" as: "To put in execution; to cause to take effect; as, to *enforce* the laws." *Id.*, at 396. See also J. Worcester, Dictionary of the English Language 484 (1860) ("To put in force; to cause to be applied or executed; as, 'To *enforce* a law'"). Nothing in §5 allows Congress to go *beyond* the provisions of the Fourteenth Amendment to proscribe, prevent, or "remedy" conduct that does not *itself* violate any provision of the Fourteenth Amendment. So-called "prophylactic legislation" is reinforcement rather than enforcement.

*Morgan* asserted that this commonsense interpretation "would confine the legislative power . . . to the insignificant role of abrogating only those state laws that the judicial branch was prepared to adjudge unconstitutional, or of merely informing the judgment of the judiciary by particularizing the 'majestic generalities' of §1 of the Amendment." 384 U. S., at 648–649. That is not so. One must remember "that in 1866 the lower federal courts had no general jurisdiction of cases alleging a deprivation of rights secured by the Constitution." R. Berger, Government By Judiciary 247 (2d ed. 1997). If, just after the Fourteenth Amendment was ratified, a State had enacted a law imposing racially discriminatory literacy tests (different questions for different races) a citizen prejudiced by such a test would have had no means of asserting his constitutional right to be free of it. Section 5 authorizes Congress to create a cause of action through which the citizen may vindicate his Fourteenth Amendment rights. One of the first pieces of legislation passed under Congress's §5 power was the Ku Klux Klan Act of April 20, 1871, 17 Stat. 13, entitled *"An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes."* Section 1 of that Act, later codified as Rev. Stat. §1979, 42 U. S. C. §1983, authorized a cause of action against "any person who, under

color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States." 17 Stat. 13. Section 5 would also authorize measures that do not restrict the States' substantive scope of action but impose requirements directly related to the *facilitation* of "enforcement"—for example, reporting requirements that would enable violations of the Fourteenth Amendment to be identified.[2] But what § 5 does *not* authorize is so-called "prophylactic" measures, prohibiting primary conduct that is itself not forbidden by the Fourteenth Amendment.

The major impediment to the approach I have suggested is *stare decisis.* A lot of water has gone under the bridge since *Morgan,* and many important and well-accepted measures, such as the Voting Rights Act, assume the validity of *Morgan* and *South Carolina.* As Prof. Archibald Cox put it in his Supreme Court Foreword: "The etymological meaning of section 5 may favor the narrower reading. Literally, 'to enforce' means to compel performance of the obligations imposed; but the linguistic argument lost much of its force once the *South Carolina* and *Morgan* cases decided that the power to enforce embraces any measure appropriate to effectuating the performance of the state's constitutional duty." Foreword: Constitutional Adjudication and the Promotion of Human Rights, 80 Harv. L. Rev. 91, 110–111 (1966).

---

[2] Professor Tribe's treatise gives some examples of such measures that facilitate enforcement in the context of the Fifteenth Amendment:

"The Civil Rights Act of 1957, 71 Stat. 634, authorized the Attorney General to seek injunctions against interference with the right to vote on racial grounds. The Civil Rights Act of 1960, 74 Stat. 86, permitted joinder of states as parties defendant, gave the Attorney General access to local voting records, and authorized courts to register voters in areas of systemic discrimination. The Civil Rights Act of 1964, 78 Stat. 241, expedited the hearing of voting cases before three-judge courts . . . ." L. Tribe, American Constitutional Law 931, n. 5 (3d ed. 2000).

However, *South Carolina* and *Morgan*, all of our later cases except *Hibbs* that give an expansive meaning to "enforce" in § 5 of the Fourteenth Amendment, and all of our earlier cases that even suggest such an expansive meaning in dicta, involved congressional measures that were directed exclusively against, or were used in the particular case to remedy, *racial discrimination.* See *Oregon* v. *Mitchell*, 400 U. S. 112 (1970) (see discussion *infra*); *Ex parte Virginia*, 100 U. S. 339 (1880) (dictum in a case involving a statute that imposed criminal penalties for officials' racial discrimination in jury selection); *Strauder* v. *West Virginia*, 100 U. S. 303, 311–312 (1880) (dictum in a case involving a statute that permitted removal to federal court of a black man's claim that his jury had been selected in a racially discriminatory manner); *Virginia* v. *Rives*, 100 U. S. 313, 318 (1880) (dictum in a racial discrimination case involving the same statute). See also *City of Rome* v. *United States*, 446 U. S. 156, 173–178 (1980) (upholding as valid legislation under § 2 of the Fifteenth Amendment the most sweeping provisions of the Voting Rights Act of 1965); *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409, 439–441 (1968) (upholding a law, 42 U. S. C. § 1982, banning public or private racial discrimination in the sale and rental of property as appropriate legislation under § 2 of the Thirteenth Amendment).

Giving § 5 more expansive scope with regard to measures directed against racial discrimination by the States accords to practices that are distinctively violative of the principal purpose of the Fourteenth Amendment a priority of attention that this Court envisioned from the beginning, and that has repeatedly been reflected in our opinions. In the *Slaughter-House Cases*, 16 Wall. 36, 81 (1873), the Court's first confrontation with the Fourteenth Amendment, we said the following with respect to the Equal Protection Clause:

"We doubt very much whether any action of a State not directed by way of discrimination against the negroes as a class, or on account of their race, will ever be held to

come within the purview of this provision. It is so clearly a provision for that race and that emergency, that a strong case would be necessary for its application to any other."

Racial discrimination was the practice at issue in the early cases (cited in *Morgan*) that gave such an expansive description of the effects of § 5. See 384 U. S., at 648 (citing *Ex parte Virginia*); 384 U. S., at 651 (citing *Strauder* v. *West Virginia* and *Virginia* v. *Rives*).[3] In those early days, bear in mind, the guarantee of equal protection had not been extended beyond race to sex, age, and the many other categories it now covers. Also still to be developed were the incorporation doctrine (which holds that the Fourteenth Amendment incorporates and applies against the States the Bill of Rights, see *Duncan* v. *Louisiana,* 391 U. S. 145, 147–148 (1968)) and the doctrine of so-called "substantive due process" (which holds that the Fourteenth Amendment's Due Process Clause protects unenumerated liberties, see gener-

---

[3] A later case cited in *Morgan, James Everard's Breweries* v. *Day,* 265 U. S. 545, 558–563 (1924), applied the more flexible standard of *McCulloch* v. *Maryland,* 4 Wheat. 316 (1819), to the Eighteenth Amendment, which, in § 1, forbade "the manufacture, sale, or transportation of intoxicating liquors within, the importation thereof into, or the exportation thereof from the United States . . . for beverage purposes" and provided, in § 2, that "Congress and the several States shall have concurrent power to enforce this article by appropriate legislation." Congress had provided, in the Supplemental Prohibition Act of 1921, § 2, 42 Stat. 222, that "only spirituous and vinous liquor may be prescribed for medicinal purposes." That was challenged as unconstitutional because it went beyond the regulation of intoxicating liquors for beverage purposes, and hence beyond "enforcement." In an opinion citing none of the Thirteenth, Fourteenth, and Fifteenth Amendment cases discussed in text, the Court held that the *McCulloch* v. *Maryland* test applied. Unlike what is at issue here, that case did not involve a power to control the States in respects not otherwise permitted by the Constitution. The only consequence of the Federal Government's going beyond "enforcement" narrowly defined was its arguable incursion upon powers left to the States—which is essentially the same issue that *McCulloch* addressed.

ally *Lawrence* v. *Texas,* 539 U. S. 558 (2003); *Planned Parenthood of Southeastern Pa.* v. *Casey,* 505 U. S. 833 (1992)). Thus, the Fourteenth Amendment did not include the many guarantees that it now provides. In such a seemingly limited context, it did not appear to be a massive expansion of congressional power to interpret § 5 broadly. Broad interpretation was particularly appropriate with regard to racial discrimination, since that was the principal evil against which the Equal Protection Clause was directed, and the principal constitutional prohibition that some of the States stubbornly ignored. The former is still true, and the latter remained true at least as late as *Morgan.*

When congressional regulation has not been targeted at racial discrimination, we have given narrower scope to § 5. In *Oregon* v. *Mitchell,* 400 U. S. 112 (1970), the Court upheld, under § 2 of the Fifteenth Amendment, that provision of the Voting Rights Act Amendments of 1970, 84 Stat. 314, which barred literacy tests and similar voter-eligibility requirements—classic tools of the racial discrimination in voting that the Fifteenth Amendment forbids; but found to be *beyond* the § 5 power of the Fourteenth Amendment the provision that lowered the voting age from 21 to 18 in state elections. See 400 U. S., at 124–130 (opinion of Black, J.); *id.,* at 153–154 (Harlan, J., concurring in part and dissenting in part); *id.,* at 293–296 (Stewart, J., joined by Burger, C. J., and Blackmun, J., concurring in part and dissenting in part). A third provision, which forbade States from disqualifying voters by reason of residency requirements, was also upheld—but only a minority of the Justices believed that § 5 was adequate authority. Justice Black's opinion in that case described exactly the line I am drawing here, suggesting that Congress's enforcement power is broadest when directed "to the goal of eliminating discrimination on account of race." *Id.,* at 130. And of course the *results* reached in *Boerne, Florida Prepaid, Kimel, Morrison,* and *Garrett* are consistent with the narrower compass afforded congressional

regulation that does not protect against or prevent racial discrimination.

Thus, principally for reasons of *stare decisis*, I shall henceforth apply the permissive *McCulloch* standard to congressional measures designed to remedy racial discrimination by the States. I would not, however, abandon the requirement that Congress may impose prophylactic § 5 legislation only upon those particular States in which there has been an identified history of relevant constitutional violations. See *Hibbs*, 538 U. S., at 741–743 (SCALIA, J., dissenting); *Morrison*, 529 U. S., at 626–627; *Morgan*, 384 U. S., at 666–667, 669, 670–671 (Harlan, J., dissenting).[4] I would also adhere to the requirement that the prophylactic remedy predicated upon such state violations must be directed against the States or state actors rather than the public at large. See *Morrison, supra,* at 625–626. And I would not, of course, permit any congressional measures that violate other provisions of the Constitution. When those requirements have been met, however, I shall leave it to Congress, under constraints no tighter than those of the Necessary and Proper Clause, to decide what measures are appropriate under § 5 to prevent or remedy racial discrimination by the States.

---

[4] Dicta in one of our earlier cases seemed to suggest that even *nonprophylactic* provisions could not be adopted under § 5 except in response to a State's constitutional violations:

"When the State has been guilty of no violation of [the Fourteenth Amendment's] provisions; when it has not made or enforced any law abridging the privileges or immunities of citizens of the United States; when no one of its departments has deprived any person of life, liberty, or property without due process of law, or denied to any person within its jurisdiction the equal protection of the laws; when, on the contrary, the laws of the State, as enacted by its legislative, and construed by its judicial, and administered by its executive departments, recognize and protect the rights of all persons, the amendment imposes no duty and confers no power upon Congress." *United States* v. *Harris,* 106 U. S. 629, 639 (1883).

I do not see the textual basis for this interpretation.

I shall also not subject to "congruence and proportionality" analysis congressional action under § 5 that is *not* directed to racial discrimination. Rather, I shall give full effect to that action when it consists of "enforcement" of the provisions of the Fourteenth Amendment, within the broad but not unlimited meaning of that term I have described above. When it goes beyond enforcement to prophylaxis, however, I shall consider it ultra vires. The present legislation is plainly of the latter sort.

* * *

Requiring access for disabled persons to all public buildings cannot remotely be considered a means of "enforcing" the Fourteenth Amendment. The considerations of long accepted practice and of policy that sanctioned such distortion of language where state racial discrimination is at issue do not apply in this field of social policy far removed from the principal object of the Civil War Amendments. "The seductive plausibility of single steps in a chain of evolutionary development of a legal rule is often not perceived until a third, fourth, or fifth 'logical' extension occurs. Each step, when taken, appeared a reasonable step in relation to that which preceded it, although the aggregate or end result is one that would never have been seriously considered in the first instance. This kind of gestative propensity calls for the 'line drawing' familiar in the judicial, as in the legislative process: 'thus far but not beyond.'" *United States* v. *12 200-ft. Reels of Super 8MM. Film,* 413 U. S. 123, 127 (1973) (Burger, C. J., for the Court) (footnote omitted). It is past time to draw a line limiting the uncontrolled spread of a well-intentioned textual distortion. For these reasons, I respectfully dissent from the judgment of the Court.

JUSTICE THOMAS, dissenting.

I join THE CHIEF JUSTICE's dissent. I agree that Title II of the Americans with Disabilities Act of 1990 cannot be a

congruent and proportional remedy to the States' alleged practice of denying disabled persons access to the courts. Not only did Congress fail to identify any evidence of such a practice when it enacted the ADA, *ante,* at 541–548, Title II regulates far more than the provision of access to the courts, *ante,* at 548–554. Because I joined the dissent in *Nevada Dept. of Human Resources* v. *Hibbs,* 538 U. S. 721 (2003), and continue to believe that *Hibbs* was wrongly decided, I write separately only to disavow any reliance on *Hibbs* in reaching this conclusion.