# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
March 14, 2012

No. 10-11254

Lyle W. Cayce
Clerk

LESLIE GREER,

> Plaintiff - Appellant

v.

RICHARDSON INDEPENDENT SCHOOL DISTRICT,

> Defendant - Appellee

Appeals from the United States District Court
for the Northern District of Texas
USDC No. 3:08-CV-160

Before STEWART, CLEMENT, and GRAVES, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:[*]

Leslie Greer appeals the district court's grant of summary judgment in favor of Richardson Independent School District ("RISD") on her claims of discrimination under Title II of the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act. For the following reasons, we affirm.

## FACTS AND PROCEEDINGS

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-11254

Greer, who uses a wheelchair for mobility as a result of a spinal cord injury, attended her son's junior varsity football game at RISD's Berkner B stadium, located at Berkner High School in Richardson, Texas, on October 4, 2007. After entering the stadium, Greer realized that the only way to access the stadium's bleacher seating was by climbing a flight of stairs. Unable to access the stadium's bleachers, Greer maneuvered her wheelchair to an accessible paved area adjacent to the bleachers where she watched the football game through a chain link fence that surrounds the field while her husband watched the game from the bleachers. From her viewpoint, Greer claims she was only able to observe roughly 15% of the game due to her view being blocked by football players standing on the sideline. She also claims the area, while accessible by a wheelchair, was slightly sloped, which required her to hold on to the fence to avoid slowly rolling backwards. It is not disputed that Greer was able to access other aspects of the stadium, including being able to park at the stadium, navigate from the parking lot to the stadium, buy a ticket to the game, and buy a hot dog and beverage at the concession stand.

On February 1, 2008, Greer sued RISD, claiming that it discriminated against her by excluding her from participation in the benefits, programs and activities of a governmental entity receiving federal assistance, in violation of Title II of the ADA, 42 U.S.C. § 12101, *et seq.* and the Rehabilitation Act of 1973, 29 U.S.C. §§ 794 and 794a. The basis of Greer's original complaint focused solely on her exclusion from the bleachers at Berkner B stadium.

The parties filed cross-motions for summary judgment in December 2008. At a motion hearing on March 4, 2009, the district court granted leave for RISD to amend its answer to assert the affirmative defense of "undue burden" with respect to making accessibility modifications to the Berkner B stadium and reopened discovery as to that limited issue. On July 9, 2009, the Court granted Greer leave to file a Second Amended Complaint, in which she expanded her

2

claims to include accessibility allegations regarding other aspects of the Berkner B stadium including restroom access, curb cuts, ramp access to a public right of way, and access to the track surrounding the football field. RISD then filed a Third Amended Answer on July 17, 2009.

Both parties again filed cross-motions for summary judgment on August 3, 2009, and Greer also filed a motion to extend discovery and allow subsequent briefing on RISD's defense that modifications to the Berkner B stadium would represent an undue burden. The district court granted Greer's motion and extended the case deadlines once again.

On February 1, 2010, the parties filed their third and final cross-motions for summary judgment. Greer also filed a Motion to Strike Undue Burden Defense and for Sanctions on April 21, 2010, claiming RISD's undue burden defense was asserted in bad faith. Greer's motion argued that RISD never had a factual basis for asserting the undue burden defense because it never produced evidence that it had conducted the three-part analysis required under 28 C.F.R. § 35.150(a)(3).

The district court granted RISD's motion for summary judgment in part on August 2, 2010, finding that Greer failed to present a prima facie case of discrimination under Section II of the ADA. *Greer v. Richardson Indep. Sch. Dist.*, 752 F. Supp. 2d 746, 754 (N.D. Tex. 2010) ("*Greer I*"). In addition, the district court granted summary judgment in part to Greer on her allegation that a ramp installed at the stadium did not comply with ADA Accessibility Guidelines for Buildings and Facilities ("ADAAG") requirements, *id.* at 758, denied Greer's motion to strike and for sanctions, *id.*, and reserved judgment on Greer's claim of parking lot accessibility pending additional briefing from the parties. *Id.* at 757.

On August 12, 2010, the parties submitted a Joint Stipulation, agreeing on the number of parking spaces available at Berkner B but disagreeing as to

No. 10-11254

whether the accessible spaces comply with the ADAAG.  Also on August 12, 2010, RISD filed a Motion for Reconsideration as to the grant of summary judgment in favor of Greer on the ramp, claiming there was summary judgment evidence proving the ramp's compliance with the ADAAG. Greer filed a Motion for Findings of Fact on August 20, 2010, requesting the district court explain its denial of her motion to strike and for sanctions.  The district court issued an order a week later in response to Greer's motion, explaining that RISD did not assert the undue burden defense in bad faith and that the court allowed RISD to assert the defense "in light of the scattershot allegations [Greer] pled in her Complaint" in case it became necessary to determine the issue pending the resolution of the summary judgment motions. Finally, RISD filed a supplemental brief on September 2, 2010, arguing that this court's then-newly-decided opinion on panel rehearing in *Frame v. City of Arlington*, 616 F.3d 476 (5th Cir. 2010), *vacated by* 632 F.3d 177 (5th Cir. 2011), controlled.

The district court disposed of all pending motions and claims on November 12, 2010 in favor of RISD, granting its motion for reconsideration regarding the ramp and subsequently granting summary judgment in favor of RISD on the issues of the ramp and the accessible parking spaces in light of *Frame. Greer v. Richardson Indep. Sch. Dist.*, 752 F. Supp. 2d 759, 762–63 (N.D. Tex. 2010) ("*Greer II*").

Greer appeals the district court's rulings on summary judgment and on the denial of sanctions.  Greer argues the district court improperly weighed evidence in granting summary judgment in favor of RISD and that it erred by failing to find as a matter of law that relegating disabled patrons to a non-accessible area of the stadium is discriminatory. Greer also challenges the district court's reversal of its own decision regarding the accessible ramp in light of *Frame* and continues to assert her claim that RISD should be sanctioned for raising the undue burden defense.

No. 10-11254

## STANDARD OF REVIEW

We review a grant of summary judgment *de novo*, applying the same legal standard as the district court. *Int'l Fid. Ins. Co. v. Sweet Little Mex. Corp.*, 665 F.3d 671, 679 (5th Cir. 2011). Summary judgment should be rendered if the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). We view all disputed facts in the light most favorable to the non-moving party. *Int'l Fid. Ins. Co.*, 665 F.3d at 679. We review the district court's ruling regarding sanctions for abuse of discretion. *Whitehead v. Food Max of Miss., Inc.*, 332 F.3d 796, 803 (5th Cir. 2003). Under this deferential standard, "an abuse of discretion only occurs where no reasonable person could take the view adopted by the trial court." *Friends for Am. Free Enter. Ass'n v. Wal-Mart Stores, Inc.*, 284 F.3d 575, 578 (5th Cir. 2002) (internal quotation omitted).

## DISCUSSION

### A. ADA and Existing Structures

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[1] 42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.130(a) ("No qualified individual with a disability shall, on the basis

---

[1]  Section 504 of the Rehabilitation Act provides nearly identical language. "No otherwise qualified individual with a disability in the United States, . . . , shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).  Because the language and standards are virtually identical for Title II of the ADA and Section 504 of the Rehabilitation Act, we consider Greer's claims under both statutes concurrently but will refer only to the ADA for brevity.  *See* 28 C.F.R. pt. 35, app. B ("Because title II of the ADA essentially extends the antidiscrimination prohibition embodied in section 504 to all actions of State and local governments, the standards adopted in this part are generally the same as those required under section 504 for federally assisted programs.").

5

of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity"). The implementation of Title II and the construction and access requirements, as it pertains to ensuring public facilities are accessible to individuals with disabilities, are articulated in the ADAAG regulations. These regulations provide the minimum technical requirements for ADA compliance for newly constructed facilities and for alterations made to existing facilities. 28 C.F.R. pt. 36 app. A.[2] There is no dispute that RISD is a governmental entity of the State of Texas and is subject to the requirements of the ADA, the Rehabilitation Act, and the relevant implementing regulations.

When enacting the ADA, Congress acknowledged that some public entities operating then-existing buildings and structures would be unable to comply with all technical aspects of the new ADAAG regulations. Accordingly, the regulations promulgated by the United States Attorney General to implement the requirements of Title II differentiate between structures built prior to the Act taking effect in January 1992 ("existing facilities") and facilities built or altered after January 1992. *Tennessee v. Lane*, 541 U.S. 509, 531–32 (2004); 28 C.F.R. § 35.104. The accessibility requirements for existing facilities are less stringent and more flexible than for new facilities. "[I]n the case of older facilities, for which structural change is likely to be more difficult, a public entity may comply with Title II by adopting a variety of less costly measures, including relocating services to alternative, accessible sites and assigning aides to assist persons with disabilities in accessing services." *Lane*, 541 U.S. at 532. It is

---

[2] The Rehabilitation Act has a set of standards nearly identical to the ADAAG called the Uniform Federal Accessibility Standards ("UFAS"). 41 C.F.R. pt. 101–19.6, app. A. Public entities subject to Title II may comply with either set of standards when constructing a new facility or altering an existing facility. 28 C.F.R. § 35.151(c).

No. 10-11254

undisputed that RISD's Berkner B stadium, built in 1968, qualifies as an existing structure.

When considering ADA compliance for such existing structures, the touchstone is thus not the facility's technical compliance with the ADAAG, but is instead "program accessibility." "A public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a). Making a program or activity accessible under this standard does not require a public entity to make all of its existing facilities accessible to disabled individuals nor does it require a public entity to take an action that would place an undue burden on the entity. *Id.* at (a)(1), (3). Furthermore, the regulations do not provide any objective criteria for evaluating program accessibility. While an existing facility's compliance with the ADAAG regulations may be informative, program accessibility is ultimately a subjective determination by viewing the program or activity at issue in its entirety and not solely by evaluating individual elements of the facility where the program is held.[3]

---

[3] While there is little precedent in this circuit regarding the application of the ADAAG to existing facilities, we note that courts in various other circuits have refused to strictly apply ADAAG requirements to existing facilities but instead rely on the ADAAG for guidance. *See, e.g., Chaffin v. Kan. State Fair Bd.*, 348 F.3d 850, 861 (10th Cir. 2003) ("[W]hen determining the compliance of existing facilities with the ADA under program accessibility, courts must look at the accessibility of the facilities as a whole, not at individual elements.") (citation and internal quotation omitted); *Parker v. Universidad de P.R.*, 225 F.3d 1, 6 (1st Cir. 2000) ("Title II's emphasis on 'program accessibility' rather than 'facilities accessibility' was intended to ensure broad access to public services, while, at the same time, providing public entities with the flexibility to choose how best to make access available."); *Ass'n for Disabled Ams. v. City of Orlando*, 153 F. Supp. 2d 1310, 1322 (M.D. Fla. 2001) ("Title II, the regulations implementing it, and the (admittedly sparse) case law interpreting it, do not require that facilities built prior to 1992 comply with the stringent technical standards imposed on facilities built after 1992."); *Access Now, Inc. v. S. Fla. Stadium Corp.*, 161 F. Supp. 2d 1357, 1368 (S.D. Fla. 2001); *Pascuiti v. N.Y. Yankees*, 87 F. Supp. 2d 221, 226 (S.D.N.Y. 1999) ("[E]ven though only new construction and alterations must comply with the [ADAAG] Standards, those Standards nevertheless provide valuable guidance . . . . Deviation from the standards is

No. 10-11254

## B. Greer's Prima Facie Case

To establish a prima facie case of discrimination under the ADA, Greer must demonstrate: (1) that she is a qualified individual within the meaning of the ADA; (2) that she was excluded from participation in, or was denied benefits of, services, programs, or activities for which RISD is responsible; and (3) that such exclusion or discrimination is because of her disability. *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004). If Greer makes a prima facie case, RISD may assert an affirmative defense by showing that the requested actions would constitute an undue financial or administrative burden. 28 C.F.R. § 35.150(a)(3).

We note that disability discrimination differs from racial discrimination in the constitutional sense. *Melton*, 391 F.3d at 672.[4] To determine whether RISD discriminated against Greer on the basis of her disability, we rely on the language of the ADA itself and its applicable definition of discrimination—whether the junior varsity football game at Berkner B was an accessible program at an existing facility. If the football game is not readily accessible to someone with a disability, Greer may have stated a prima facie case of discrimination. On the other hand, if it is apparent that RISD provides sufficient program access to football games held at Berkner B, Greer has failed to establish a prima facie case and the district court was correct in denying Greer's summary judgment motion.

The parties do not dispute that Greer satisfies elements one and three in establishing a prima facie case: she is a qualified individual under the ADA and

---

relevant but not determinative; it is one consideration from which the court may conclude that noncompliance impedes access.").

[4] Greer fails to recognize this difference and attempts to equate her situation with a black spectator forced to watch the game from an area separated from the general public bleacher seating. Reply Brief for Appellant at 12–13. This is a flawed analogy and evidences a misunderstanding of disability discrimination claims under the ADA.

any alleged exclusion or discrimination was a result of her disability—her inability to access the Berkner B bleachers while in a wheelchair. As a result, the primary question before this court is whether the district court properly found that Greer failed to satisfy element two, and thus failed to present a prima facie case, by showing that there was insufficient program access when she attended the football game at Berkner B.

Establishing exactly what constitutes sufficient access to the "program"—watching her son's football game—was a primary concern of the district court and continues to be a matter of debate on appeal. The following exchange between the district court and Greer's counsel at the hearing on the parties' cross-motions for summary judgment is instructive.

> The district court:
>
> That the key issue with respect to this subject, as the plaintiff would characterize it, is that [providing alternative accessible viewing areas] doesn't do because it's not just watching the game that matters, which Ms. Greer, or others, seated in one of those areas could do, but it is the experience of watching the game with the other fans.
>
> Greer's counsel in response:
>
> But to the extent that the basic argument is that are you entitled to keep the disabled out of the general seating area versus not, then I would agree that that is a fair assessment of one of the central issues before the Court."

In light of the prior proceedings and the parties' briefs, we understand Greer's general contention to be this: "program access" is more than just the ability to watch the football game at the Berkner B stadium. Instead program access requires that a disabled individual such as Greer not only be able to watch the game but also experience the game from the general admission public bleachers so as to not be separated from other attendees.

No. 10-11254

There is an aspect of Greer's segregation argument that rings true as noted by the district court during its hearing on the cross-motions for summary judgment. It would likely not be permissible for a public entity such as RISD to claim it provides program access if it required disabled individuals to sit alone in an area far removed from her companions and other attendees, such as behind the goal posts at the end of the field, when all other attendees were seated along the sidelines. Yet we need not determine where that line exists here—how far away is too far away—because, as the photos in the record show, all of the accessible seating offered by RISD is either immediately adjacent to or in front of the bleacher seating for the general public.

However, we disagree with Greer's suggestion that any separation from the general public seating area is *ipso facto* discrimination and we do not agree with Greer's argument that she was denied program access at the Berkner B stadium. Like the district court, we note that much of Greer's argument focuses on "the actual state of ADAAG compliance at the facility" and conflates these observations about *facility* deviations from ADAAG standards, which are applicable to newly constructed or modified facilities, with RISD's obligation to provide *program* access at an existing facility.[5]

In making these arguments, Greer attempts to completely nullify the "program access" standard of review by asserting that, based on RISD's admission that the bleachers are not accessible and therefore wheelchair-bound visitors to Berkner B are provided alternate seating areas, RISD must prove that

[5] The basis for much of the confusion appears to be Greer's insistence throughout the litigation to apply a strict, technical definition of "accessible" as defined in the ADAAG to mean compliance with the ADAAG standards. She fails to appreciate that the word "accessible" was used throughout the litigation to discuss whether events at Berkner B were accessible in the context of "program accessibility," as opposed to accessible under the technical limits of the ADAAG. *See, e.g., Greer I*, 752 F. Supp. 2d at 754 ("Greer's own testimony shows that events at Berkner B Field as a whole are *accessible* to wheelchair-bound individuals.") (emphasis added).

10

modifying the stadium seating would constitute an undue financial burden in order for RISD to avoid summary judgment. This however is not an accurate interpretation of the law.  As an operator of an existing facility, RISD need only show that the *program* offered at Berkner B, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities. 28 C.F.R. § 35.150(a). Thus, despite Greer's protests that RISD's repeated statements that it "is not legally obligated to provide bleacher access for a mobility-impaired individual who has designated accessible seating available in an alternate area" are incorrect, RISD's statement is a valid interpretation of the law.  As an existing facility, RISD's duty is to provide *program* access to events at Berkner B, which may be achieved without providing access to the bleachers.

Furthermore, Greer's argument that "Keeping the disabled out of the public seating—without any justification—is a denial of program access *on its face*," Reply Br. 10, would render the "program access" standard meaningless. Under such a reading, a public entity would be required in all cases to modify existing facilities whenever the general public seating area was not wheelchair accessible or ADAAG compliant.  Yet this is precisely what the program access standard for existing facilities was meant to avoid by allowing public entities to ensure that disabled individuals can readily access the program at the facility but not necessarily all aspects of the facility itself.

As an example of conflating program access with facility access, Greer asserts in her opening brief that "The undisputed expert testimony in the case is that the [track] surface is not accessible" as an alternative seating area and supports the statement with citations to the record.  However, the cited portions of the record consist of only two items: (1) a portion of her expert's report claiming that the surface would not comply with current ADAAG standards (but

No. 10-11254

lacking any objective measurements in support of the claim),[6] and (2) a RISD representative's response to a deposition question from Greer's counsel in which the individual simply answers "I don't know" to whether the track would have to meet ADAAG new construction standards for an accessible surface.[7] Despite Greer's arguments, the focus of the district court's finding, and our review, remains on the accessibility of the program and not technical compliance with ADAAG in an existing facility. And on this point, we agree with the district court that RISD provided program access at Berkner B stadium.

Laid bare, Greer's claims in her motion for summary judgment consist only of her own statements of dissatisfaction from her experience at one football game at Berkner B and her expert's report that opines on various deviations of Berkner B's structural elements from current ADAAG requirements for new or modified facilities. Many of the observations in the expert report do not relate to whether RISD provides program access to disabled individuals attending

---

[6] While Greer repeatedly cites her expert's report that states the track surface does not comply with ADAAG, her expert subsequently testified that he "d[idn't] have any idea" whether a wheelchair could roll on the track surface. *Greer I*, 752 F. Supp. 2d at 755.

[7] We note that this type of borderline misrepresentation has been present throughout the case. The district court, upon recommendation of a magistrate judge, awarded attorneys' fees to RISD due to Greer's counsels' reckless arguments in her motion for summary judgment. *See Greer v. Richardson Indep. School Dist.*, No. 3:08-CV-0160-M, 2011 WL 3555851, at *2 (N.D. Tex. Apr. 12, 2011), *adopted as modified by* 2011 WL 3555779 (N.D. Tex. Aug 11, 2011) ("Plaintiff's counsel sought to misdirect the Court with respect to this [undue burden] defense by arguing that Defendant's expert witness, Michael Longanecker, 'agreed that the facilities at Berkner B Field were not accessible.' The District Court called this argument 'misleading at worst' and 'consistently confus[ing]' at best and held that Longanecker's testimony 'clearly states that specific elements of Berkner B Field did not comply with [ADAAG], but that the program as a whole is nevertheless accessible.'").

Greer's counsel continues to push the limits in their briefs before this court. For example, Greer's opening brief states, in part: "The undisputed facts show that there is no way to view the program, service, or activity at Berkner in its entirety as readily accessible to and usable by individuals with disabilities, when there is nothing readily accessible to and usable at Berkner stadium." Brief for Appellant at 25–26. Greer's own testimony belies the statement that "nothing is readily accessible" as Greer testified that she was able to park at the stadium, purchase a ticket, enter the stadium, make a purchase at the concession stand, and watch at least a portion of the game.

events at Berkner B and others are inapposite because Greer failed to offer evidence that the allegedly non-compliant structures in or around the Berkner B stadium have been modified since the ADA was enacted in 1992 and thus may be required to comply with the ADAAG requirements. Additionally, Greer has failed to demonstrate how minor deviations from the ADAAG requirements in various parts of the stadium identified by her expert, such as a quarter-inch variance in "maximum beveled slope" on one designated wheelchair viewing area or bathroom mirrors that are mounted seven inches too high, prevent her or other disabled individuals from accessing the program at Berkner B, i.e., watching a football game.

Instead, the district court was correct that, based on the evidence offered by RISD in support of its motion for summary judgment and not contradicted by Greer, Berkner B stadium provides program accessibility when viewed in its entirety. RISD provided sworn statements from two individuals that use wheelchairs when they attend events at Berkner B, both of whom stated that they had no issues attending events. *Greer I*, 752 F. Supp. 2d at 754–55. Greer herself admitted she was able to access the parking lot, navigate into the stadium, buy a ticket, make a purchase from the concession stand, and view a portion of the game.

Nonetheless, as Greer points out, "seeing the program is the entire reason for going." Most attendees at a high school football game, particularly parents of students playing in the game, are not going to the stadium for the quality of the hot dogs at the concession stand. Thus, being able to do things such as buying a ticket and visiting the concession stand would not be sufficient to provide program access if she was unable to view the actual football game.

Even taking as true Greer's claim that she was only able to see 15% of the game from her vantage point next to the bleachers, the problem with Greer's single experience is that it appears to be, at least in part, a product of her own

choices and was strongly contradicted by RISD's evidence. She acknowledges that she never asked if she could be accommodated by sitting somewhere else in the stadium, such as the track that surrounds the football field, that would have provided an unobstructed view.[8] She did not ask anyone at the stadium if her husband or friends could be accommodated by being provided chairs to sit next to her.  She admits she did not even attempt to use the women's restroom and thus has no basis for her claim that the restroom is not accessible other than her expert's findings that certain aspects of the restrooms do not meet ADAAG requirements for newly constructed facilities.

Moreover, this was a single experience for Greer in contrast to the sworn statements by other disabled individuals who have attended numerous events at Berkner B without issues. Had she returned to the stadium several times and routinely not been provided suitable seating despite attempting to seek out event staff or asking for better accommodations, her prima facie claim might ring true. However, based on the record before this court, she has not returned to Berkner B stadium and thus her claims are tied to her single experience at the facility.

By pointing out Greer's failure to make any inquiry regarding more suitable accommodations, we do not imply that the burden is or should be on disabled individuals to actively request accessible accommodations in all situations.[9]  As this court, and courts in other circuits have held, there is a common sense aspect to determining whether a public entity has provided accommodations for a disabled individual, part of which requires the public

---

[8]  Greer was asked during her deposition, "Did you ask anyone whether there were other places to set up?"  She answered, "No, and I shouldn't have to."  She was also asked "Did you ask [the person selling tickets at the entrance to the stadium] about accessibility when you got there?"  Greer answered: "No, because I was right at the gate. I didn't really experience anything until I got past that gentleman."

[9]  In an employment context, there is a general responsibility for an individual with a disability to inform the employer that an accommodation is needed. *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996).

entity be made aware of the inadequacy of the accommodations provided. *See E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009); *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1196 (10th Cir. 2007) ("This is a 'duty dictated by common sense lest a disabled [individual] keep his disability a secret and sue later for failure to accommodate.'") (alteration in original) (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir.1996)). However, a disabled person's failure to expressly "request" an accommodation is not fatal to an ADA claim where the defendant otherwise had knowledge of the individual's disability and needs but took no action. *See McCoy v. Texas Dep't of Criminal Justice*, No. C-05-370, 2006 WL 2331055, at *7–8 (S.D. Tex. Aug. 9, 2006) (collecting cases from multiple circuits). Taken together, there is a balance to be struck between a disabled individual's need to request accommodations when limitations are not obvious or apparent and a public entity's duty to provide accommodations without further notice or a request. *Id.*

Under the facts here, when a disabled individual such as Greer attends one event at a venue she was otherwise unfamiliar with, that person does not by default gain a prima facie case of discrimination under Title II merely because she is dissatisfied with her seating location and makes no effort to ask the venue's staff as to where alternative accessible seating is located or if she and her family can be accommodated. By Greer's own admission, she was able to access all aspects of the stadium she attempted to use during her visit—the parking lot, the sidewalks, the ticket booth, the concession stand, and one of the several accessible seating areas. Her argument focuses on her inability to see the whole game from her viewing point for the game without giving RISD any opportunity to reaccommodate her or her companions such that she could have a better viewpoint. Considering the size and types of events held at Berkner B, such as football games and track meets, it is unclear how RISD officials would be able to develop a universal accessibility plan that would always satisfy the

No. 10-11254

viewing preferences for disabled individuals other than by what they have already done—providing several alternative accessible seating areas. Stated differently, simply asking a few questions of the event venue's staff for more suitable accommodations is likely to be more effective and consistent with case law than remaining silent and resorting to a Title II discrimination claim in the federal court system.

Even setting aside whether Greer sought out any accommodations, her single experience at Berkner B does not reflect RISD's accessibility policies or the uncontroverted experiences of other disabled individuals that have regularly attended events at Berkner B. RISD's stated policy, uncontroverted by Greer, states: "The District provides accessible parking, an accessible entrance, employees who are available to assist patrons who desire assistance, and an ability for all patrons, including individuals with disabilities, to participate in or view the events and programs at the Berkner B Field. Patrons of the Berkner B Field, including individuals with disabilities and their companions, are provided seating on the track, behind the fence, or any other accessible area so that they can participate in or view the events and programs." The testimony from two regular attendees of events at Berkner B reinforce the veracity of RISD's policy, as both individuals testified that they have always been provided accessible seating with their companions, often on the track, and that neither attendee had difficulties accessing any of the Berkner B facilities, including navigating on the track surface in their wheelchairs. One of the two individuals even noted that a seat on the track provides a better view than a seat in the bleachers. *Greer I*, 752 F. Supp. 2d at 754–55.

While Greer decries the district court's reliance on such statements as an improper weighing of evidence at the summary judgment stage, we disagree with Greer's characterization. The parties had simultaneously submitted cross-motions for summary judgment. Thus, what at first glance may appear to be a

weighing of evidence is actually a sequential analysis of each party's motion. Although the district court announced its decision on each party's respective motion in a single paragraph, the motions were considered separately. *Id.* at 755–56.

First, the district court denied Greer's motion, finding that she had not presented a prima facie case of discrimination. Second, the court granted RISD's motion, on the basis of evidence it offered, finding that events at Berkner B are accessible to wheelchair-bound individuals based on Greer's own testimony and sworn testimony of other wheelchair-bound individuals that regularly attend events at the stadium. Though not highlighted explicitly in the district court's opinion, Greer, as the nonmoving party in response to RISD's motion, needed to come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists with respect to program access. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In responding to RISD's motion, Greer relied only on her own single experience and an expert report focused on *facility* access and failed to produce any countervailing evidence to show that a genuine issue of material fact existed with respect to *program* access. She offered no contradicting evidence about program access at Berkner B such as being refused more agreeable accessible seating such as the track. She made no attempt to use the track and thus has no basis to claim she was unable to access it or that the surface prevents RISD from designating the track as an alternative viewing area. She did not ask if her husband and friends could be seated near her. She did not request to speak with a stadium staff member to voice a complaint about the accessible seating or request additional accommodations or an alternate seating location. This was not a weighing of evidence by the district court—Greer simply had no contrary evidence to dispute RISD's summary judgment evidence that it provided program access to disabled individuals who successfully and regularly attended

17

events, including football games, at Berkner B, nor did she present evidence that a genuine issue of fact exists as to whether track access to watch football games at Berkner B fails the program accessibility test. Under Greer's argued approach, if district courts were required to find that a genuine issue of material fact existed in every case where the plaintiff simply asserted that his or her experience was different than sworn testimony or evidence offered by the defendant, every plaintiff could generate a genuine issue of "material" fact. This is not, and cannot be, the rule—in responding to a defendant's motion for summary judgment, a plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts" and "must come forward with specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 586 (internal quotation and citation omitted) (emphasis in original).

In summary, what the district court, and now this court, is presented with are Greer's allegations that her experience watching a football game at Berkner B was unsatisfactory in her opinion. While unfortunate, this is not sufficient to present a prima facie case of disability discrimination under the program access standard and the district court's grant of summary judgment in favor of RISD was correct.

## C. Greer's Motion for Sanctions

Greer also contends the district court erred by failing to grant her motion for sanctions against RISD based on the school district's failure to produce a specific document defined by 28 C.F.R. § 35.130(a)(3) that explained the reasons making alterations to the stadium would result in an undue financial burden.

Under the highly deferential abuse of discretion standard, we cannot say the district court erred in denying Greer's motion. The district court's order in response to Greer's motion for findings of fact on her motion for sanctions set forth six logical and well-reasoned findings for denying the motion for sanctions.

In summary and most notably, the court noted that it allowed RISD to assert the undue burden affirmative defense "in light of the scattershot allegations [Greer] pled in her Complaint, and the potential issues with regard to [Greer]'s standing to assert many of her claims under the [ADA]," that the undue burden defense was not asserted in bad faith, and that consideration of the defense was mooted when Greer failed to meet her prima facie burden for an ADA discrimination claim. *Greer v. Richardson Indep. Sch. Dist.*, No. 3:08-CV-160-M (N.D. Tex. Aug. 27, 2010) (Order regarding Plaintiff's Motion for Findings of Fact on Plaintiff's Motion to Strike Undue Burden Defense and for Sanctions).

While Greer strenuously argues that RISD failed to show that any undue burden analysis was ever made and thus RISD and its counsel asserted a defense that had no evidentiary basis in fact, we disagree. As RISD notes, there is little case law on point as to what is required to satisfy the requirement under 28 C.F.R. § 35.150(a)(3), which states:

> In those circumstances where personnel of the public entity believe that the proposed action would fundamentally alter the service, program, or activity or would result in undue financial and administrative burdens, a public entity has the burden of proving that compliance with § 35.150(a) of this part would result in such alteration or burdens. The decision that compliance would result in such alteration or burdens must be made by the head of a public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity, and must be accompanied by a written statement of the reasons for reaching that conclusion.

Greer focuses on what she claims is RISD's failure to demonstrate that any undue burden analysis was ever made as evidenced by RISD's failure to produce a "written statement" pursuant to § 35.150(a)(3). This argument however focuses too narrowly on subsection (a)(3). Subsection (a)(3) is subordinate to the general subsection (a) language that a public entity must conduct the undue burden analysis only in the event that, in order to provide program accessibility,

the entity would be required to make a fundamental alteration in the nature of the program.

Here, RISD had a nonfrivolous argument that it already provided program access to events at Berkner B stadium and thus did not believe it was required to take any actions that would fundamentally alter the facility or the programs offered at Berkner B. RISD produced evidence about its evaluation of Berkner B's facilities and the budgeting process used to allocate funds for upgrades or modifications to all of the school district facilities, explaining that available funds had been allocated first to student instruction facilities and the district's "A" stadiums which serve varsity athletic events and are more heavily attended. Under this reasonable belief and a plain reading of § 35.150(a) and (a)(3), it is not clear that RISD was required to make a decision evidenced by a written statement as envisioned under subsection (a)(3). To the extent that Greer's new allegations in her second and third amended complaints filed in the midst of this litigation drew that belief into question, RISD provided substantial discovery materials related to the analyses the school district performed when evaluating what modifications would be made to facilities in the district and how budgetary funds would be allocated, by priority, to modification projects. Given these facts, the district court did not abuse its discretion when it found RISD did not assert the undue burden defense in bad faith.

## D. Application of *Frame v. City of Arlington*

While disposing of most of Greer's claims on summary judgment in favor of RISD, the district court reserved two issues with respect to whether the Berkner B parking lot contained a sufficient number of accessible parking spaces and whether a wheelchair ramp from the parking lot to a sidewalk serving an adjacent street was ADA compliant. Following this court's opinion pursuant to a panel rehearing in *Frame v. City of Arlington*, 616 F.3d 476 (5th Cir. 2010) ("*Frame II*"), *vacated and reh'g en banc granted*, 632 F.3d 177 (5th Cir. 2011), the

district court granted summary judgment in favor of RISD on both remaining issues. *Greer II*, 752 F. Supp. 2d at 762–63.

In her opening brief filed in March 2011, Greer argued the district court misinterpreted the opinion in *Frame II* and thus improperly granted summary judgment to RISD. After briefing was complete, this court issued an en banc decision, *Frame v. City of Arlington*, 657 F.3d 215 (5th Cir. 2011) (en banc) ("*Frame III*"). At the direction of the court, the parties filed letter briefs to address how the en banc decision in *Frame* may affect our review of the district court's decision on the issue of the parking lot and the ramp.

*Frame III* reversed the panel's opinion in *Frame II* that a private right of action regarding a non-compliant sidewalk only existed in the context that the sidewalk was a gateway to some other service, program, or activity. *Frame II* at 488–90. Instead, the en banc court held that a non-compliant newly constructed sidewalk itself provided a private right of action under Title II without regard to the proximity of the sidewalk to the public service or program. *Frame III* at 235. While the district court considered the parking spaces and ramp in the context of the gateway analysis, *Greer II* at 763, *Frame III* nonetheless does not change the outcome here.

The parking lot and the ramp have both been modified or constructed after 1992 and thus do not fall within the more flexible guidelines for existing facilities. Instead, the ADAAG guidelines apply. The record establishes that the parking lot servicing the Berkner B stadium contains six accessible parking spaces, which complies with ADAAG guidelines for the number of accessible spaces. Additionally, the modifications to the parking lot, including allocation and placement of accessible parking spots, and the construction of the wheelchair ramp were completed pursuant to an inspection by a Registered Accessibility Specialist, which demonstrates compliance with the Texas Accessibility Standards ("TAS"). The TAS have been certified and approved by

the Department of Justice as being equivalent to the ADAAG.  Architectural Barriers Frequently Asked Questions, Tex. Dep't of Licensing & Regulation, http://www.tdlr.state.tx.us/ab/abfaq.htm#13 ("The Texas Accessibility Standards are as stringent (in some instances more stringent) as the ADAAG and have been deemed equivalent to the ADAAG by the United States Department of Justice. The TAS received equivalency certification on September 23, 1996."). Accordingly, we affirm the district court's grant of summary judgment in favor of RISD on these two issues. *Rockwell v. Brown*, 664 F.3d 985, 990 (5th Cir. 2011) ("[W]e may affirm a grant of summary judgment on any basis supported by the record.") (internal quotation marks omitted).

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.